Jonathan L. Hauser
VSB No. 18688
TROUTMAN SANDERS LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
Telephone:    (757) 687-7768
Facsimile:    (757) 687-1505

*Counsel to the Foreign Representative*

Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| In re: | Chapter 15 |
| WHITE BIRCH PAPER COMPANY, et al., | Case No. 10-31234 (DOT) |
| Debtors in a Foreign Proceeding. | Jointly Administered |
|  | **Hearing Date: September 8, 2010 at 10:00 a.m. (ET)** |
|  | **Objection Deadline: September 3, 2010 at 5:00 p.m. (ET)** |

## MOTION FOR ENTRY OF AN ORDER RECOGNIZING THE
## (A) SISP ORDER, (B) BID PROCEDURES ORDER AND (C) SALE ORDER

White Birch Paper Company, in its capacity as foreign representative (the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors")[1] to a foreign proceeding (the "Canadian Proceeding") under the *Companies' Creditors' Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA"), pending before the Quebec Superior Court of Justice in Montreal, Quebec, Canada (the "Canadian Court"), respectfully submits this motion (the "Motion") seeking entry of an order, substantially in the form attached hereto as **Exhibit A**, recognizing and giving effect in the United States to (a) the *Order Approving the Sale and*

---

[1]    The Debtors in these cases are (a) White Birch Company, (b) Stadacona General Partner Inc., (c) Stadacona Limited Partnership, (d) F.F. Soucy Limited Partnership, (e) F.F. Soucy Inc. & Partners, Limited Partnership and (f) Papier Masson Ltee. The Debtors' U.S. service address is 80 Field Point Road, Greenwich, Connecticut 06830.

*Investor Solicitation Process* (the "SISP Order"), (b) the *Order Approving the Stalking Horse Bidder, Approving an Asset Sale Agreement, Approving Bidding Procedures for the Sale of Substantially All the WB Group's Assets and Scheduling an Auction and Sale Hearing* (the "Bid Procedures Order") and (c) the *Approval and Vesting Order* (the "Sale Order"). In support of this Motion, the Foreign Representative respectfully submits as follows:

## Jurisdiction

1.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      These cases were properly commenced pursuant to 11 U.S.C. § 1504 by the filing of a petition for recognition of the Canadian Proceeding under 11 U.S.C. § 1515.

3.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1410.

4.      The statutory bases for the relief requested herein are sections 105(a), 1520, 1525 and 1527 of title 11 of the United States Code (the "Bankruptcy Code").

## Relief Requested

5.      For the reasons set forth herein, the Foreign Representative seeks entry of an order, substantially in the form attached hereto as **Exhibit A**, recognizing and giving effect in the United States to the (a) the SISP Order, annexed as **Exhibit 1** to **Exhibit A** hereto, (b) the Bid Procedures Order, annexed as **Exhibit 2** to **Exhibit A** hereto and (c) the Sale Order, annexed as **Exhibit 3** to **Exhibit A** hereto.

## Background

6.      On February 24, 2010, the Debtors, along with certain of their affiliates,[2] sought relief under the CCAA in the Canadian Court (the "CCAA Cases").   Contemporaneously therewith, Bear Island Paper Company, L.L.C. ("Bear Island" and, together with the CCAA Applicants, the "WB Group") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").   On the same date, the Canadian Court entered an order (the "Initial CCAA Order") granting certain relief to the CCAA Applicants and appointing Ernst & Young Inc. as the Monitor of the CCAA Applicants (the "Monitor").

7.      Shortly after the Canadian Court's entry of the Initial CCAA Order, the Foreign Representative filed a petition on behalf of each Debtor pursuant to chapter 15 of the Bankruptcy Code and commenced these chapter 15 cases (the "Chapter 15 Cases") seeking recognition of its status as the Debtors' "foreign representative," as defined under section 101(24) of the Bankruptcy Code, and recognition of the Canadian Proceeding as a "foreign main proceeding" under section 1515 of the Bankruptcy Code.[3]

8.      On February 26, 2010, this Court entered an order procedurally consolidating the Chapter 15 Cases and directing that such cases be jointly administered [Docket No. 23], which was modified shortly thereafter [Docket No. 24].   On March 24, 2010, this Court entered the *Order of Recognition of a Foreign Main Proceeding and Chapter 15 Relief Pursuant to Sections 1504, 1515, 1517, 1520 and 1521 of the Bankruptcy Code* [Docket No. 55].

---

[2]    The affiliates include (a) White Birch paper Holding Company, (b) Black Spruce Paper Inc., (c) F.F. Soucy General Partner Inc., (d) 3120772 Nova Scotia Company and (e) Arrimage De Gros Cacouna Inc. (collectively with the Debtors, the "CCAA Applicants").

[3]    A more complete description of the Canadian Proceeding, the CCAA Applicants' businesses, corporate organization, capital structure and circumstances leading to the Chapter 15 Cases may be found in the *Verified Petition For Recognition of a Foreign Main Proceedings and Chapter 15 Relief Pursuant to Sections 1504, 1515, 1517, 1520 and 1521 of the Bankruptcy Code* [Docket No. 9].

**Events Leading to a Sale of Substantially All of the Debtors' Assets**

9.     Since the Petition Date, the WB Group has undertaken affirmative steps to restructure its operations in accordance with the milestones contained in the WB Group's $140,000,000 Senior Secured Super-Priority Debtor in Possession Term Loan Credit Agreement, dated February 24, 2010 (as defined in the Initial CCAA Order, the "DIP Facility" or "Interim Financing Credit Agreement").     Such milestones govern the WB Group's dual-track restructuring, which required that the WB Group contemporaneously pursue (a) a chapter 11 plan of reorganization in conjunction with a plan of arrangement for the CCAA Applicants (collectively, the "Cross-Border Plan") and (b) a going-concern sale of all or substantially all of the WB Group's assets (the "Assets") pursuant to the CCAA and section 363 of the Bankruptcy Code.

10.     Despite management's good-faith efforts, the WB Group was unable to satisfy the milestone under the DIP Facility that required that the WB Group enter into a lock-up and plan support agreement regarding the Cross-Border Plan with the required lenders under the certain First Lien Term Loan Agreement, dated April 8, 2005 (as amended and restated on January 27, 2006 and May 8, 2007) by June 15, 2010 (the "First Lien Term Loan Agreement"). Accordingly, pursuant to the terms of the DIP Facility, the WB Group was required to move forward with, and meet the milestones towards consummating, the sale of all or any portion of the Assets free and clear of liens, claims, encumbrances and interests (the "Sale").

**The Sale and Investor Solicitation Process and Procedures**

11.     Pursuant to section 5.19(a)(i) of the DIP Facility, on April 23, 2010, the CCAA Applicants filed the *Motion to Approve a Sale and Investor Solicitation Process* (the "SISP Procedures"). The SISP Procedures describe, among other things, (a) the Assets, (b) the manner in which prospective bidders will be solicited and may gain access to due diligence materials

concerning the Assets, (c) the manner in which bidders and bids become qualified and (d) the manner in which bids will be solicited and negotiated. On April 29, 2010, the Canadian Court entered the SISP Order. By this Motion, the Foreign Representative seeks recognition of the SISP Order, and the relief granted therein, in these Chapter 15 Cases.

### The Sale Process and Bid Procedures Order

12.     In accordance with the SISP Procedures, beginning in April 2010, the WB Group, in conjunction with their advisors, including Lazard Frères & Co. LLC ("Lazard"), engaged in a comprehensive and good-faith sale process to sell the Assets. To that end, Lazard prepared a list of both strategic and financial parties who, in Lazard's reasonable professional judgment, may have been interested in acquiring the Assets (the "Potential Bidders"). Concurrently therewith, the WB Group and Lazard prepared an initial offering summary (the "Teaser Letter") to notify Potential Bidders of the existence of the Sale and invite Potential Bidders to express their interest by submitting an offer to acquire all or substantially all of the Assets.

13.     Since May 3, 2010, the WB Group and Lazard have contacted 52 Potential Bidders and provided each with a Teaser Letter. From May 3, 2010 through June 15, 2010, 22 parties expressed interest in the Sale, 16 of which executed confidentiality agreements. Of those 16 entities, 14 were determined in the CCAA Applicants' business judgment to be capable of consummating the Sale (each, a "Phase I Qualified Bidder"). Each Phase I Qualified Bidder received a confidential information memorandum and was given access to a virtual data room which contained information regarding the Assets.

14.     By June 15, 2010, the CCAA Applicants had received non-binding indications of interest from four of the Phase I Qualified Bidders regarding the purchase of all or any portion of

the Assets.[4]  The WB Group and its advisors evaluated these indications of interest, and, based upon such analysis, invited two such parties (each, a "Phase II Qualified Bidder") to participate in further discussions and complete a due diligence process with respect to the Assets, with the intent that one of these parties would serve as a stalking horse bidder.

15.     From June 15, 2010 through July 15, 2010, the WB Group and its advisors engaged in active discussions with the Phase II Qualified Bidders as they conducted additional due diligence.  Indeed, the Phase II Qualified Bidders met with the WB Group's management and participated in site visits at various WB Group facilities in an effort to complete a comprehensive due diligence process.  By July 15, 2010, the WB Group received one offer to purchase substantially all of the Assets (the "Stalking Horse Bid"), which, as required by the SISP Procedures and SISP Order, included, among other things, a description of the assets to be purchased, the purchase price and other ancillary agreements and conditions related to the Sale.

16.     Upon the WB Group's review of the Stalking Horse Bid, and after consultation with its advisors, on August 10, 2010, certain members of the WB Group (the "Sellers")[5] entered into that certain Asset Sale Agreement (the "Sale Agreement"), by and between the Sellers and BD White Birch Investment LLC (the "Purchaser").  The Sale Agreement was negotiated in good faith and at arms-length and the Purchaser has confirmed that it intends to move forward with the Sale as contemplated under the Sale Agreement and serve as the "Stalking Horse Bidder" for the Assets.

---

[4]     After June 15, 2010, Lazard received inquiries from 14 additional parties interested in the Sale, including certain lenders under the First Lien Term Loan Agreement.  These parties were provided with confidentiality agreements.

[5]     The Sellers are comprised of White Birch Paper Company, Stadacona General Partner Inc., Stadacona L.P., F.F. Soucy General Partner Inc., F.F. Soucy, Inc. & Partners, Limited Partnership, F.F. Soucy L.P., Arrimage de Gros Cacouna Inc., Papier Masson Ltée and Bear Island.

17.     In accordance with the Sale Agreement, on August 10, 2010, the CCAA Applicants filed the *Motion to Approve a Stalking Horse Bidder, to Approve an Asset Sale Agreement, to Approve Bidding Procedures for the Sale of Substantially all the WB Group's Assets and to Schedule an Auction and Sale Hearing* (the "Bid Procedures Motion") with the Canadian Court.  Pursuant thereto, the CCAA Applicants are seeking entry of the Bid Procedures Order, which authorizes the Purchaser to serve as the Stalking Horse Bidder, subject to maintaining a competitive bidding process that provides for the Sale of the Assets subject to higher or otherwise better offers.

18.     The CCAA Applicants propose certain procedures, substantially in the form attached hereto as **Exhibit B**, to govern the ongoing bid process (the "Bid Procedures").  The Bid Procedures are the same procedures that Bear Island proposes in its *Motion of Bear Island Paper Company, L.L.C. For Entry of Orders Approving the (A) Form of the Sale Agreement, (B) Bidding Procedures, (C) Form and Manner of Notice of the Auction and Sale Hearing, (D) Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (E) Sale of Assets Free and Clear of Liens, Encumbrances and Interests and (F) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "Bear Island Sale Motion") [Docket No. 403].

19.     In sum, the Bid Procedures identify the criteria that potential bidders must satisfy to propose a qualified bid for consideration at an auction for the Assets, if necessary.  In addition, the Bid Procedures provide that all bids must be received by August 30, 2010 (the "Bid Deadline") and that if an auction for the Assets is necessary, it will take place on September 1, 2010.  If, however, no qualified bids are received before the Bid Deadline, the Sale of the Assets

shall proceed pursuant to the terms and conditions set forth in the Sale Agreement, which contemplates conducting a hearing to authorize the Sale on or before September 8, 2010.

20.     The hearing to consider the relief requested in Bid Procedures Motion is scheduled to be held on August 24, 2010.  Subject to entry of the Bid Procedures Motion by the Canadian Court, the Foreign Representative hereby seeks recognition of the Bid Procedures Order in these Chapter 15 Cases.

## The Sale Order

21.     Upon completion of the competitive bidding process set forth in the Bid Procedures, the CCAA Applicants intend to seek approval of the Sale through the entry of the Sale Order.  A hearing to consider the Sale Order in the CCAA Cases is scheduled to be held on or before September 8, 2010.  Subject to entry of the Sale Order by the Canadian Court, the Foreign Representative hereby seeks recognition of the Sale Order in these Chapter 15 Cases.

## Supporting Authority

22.     Upon a bankruptcy court's granting recognition of a foreign representative and a foreign main proceeding, relief is available to the petitioner under sections 1520, 1525 and 1527 of the Bankruptcy Code.

23.     Pursuant to section 1520 of the Bankruptcy Code, section 363 of the Bankruptcy Code applies "to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate."  11 U.S.C. § 1520(a)(2); *In re Atrimm, S.r.L.*, 335 B.R. 149, 159 (Bankr. C.D. Cal. 2005) ("under chapter 15, § 363 (governing sale, use or lease of property of the estate) . . . appl[ies] to any transfer of an interest of the debtor in property within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of a domestic

bankruptcy estate.") (citing 11 U.S.C. § 1520(a)(2)); *see also In re SPhinX, Ltd.*, 351 B.R. 103, 115 (Bankr. S.D.N.Y. 2006).

24.     The relief requested herein satisfies the requirements of section 363 of the Bankruptcy Code.  Indeed, section 363(b)(1) of the Bankruptcy Code authorizes a debtor to use or sell assets of the estate, other than in the ordinary course of business, so long as the debtor satisfies the "sound business purpose test."  This test consists of four factors that courts generally consider when determining whether a pre-confirmation sale of a chapter 11 debtor's assets is appropriate:  (i) a sound business reason or emergency justifying the sale; (ii) good faith; (iii) adequate and reasonable notice; and (iv) fair and reasonable purchase price.[6]  The Debtors contend that the Sale satisfies the sounds business purpose test for the following reasons.

25.     *First*, the "sound business reason" factor is similar to the 'business judgment rule,' which provides great deference to a debtor's determination of its own best interests." *In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997).  Additionally, a debtor's showing of a sound business purpose is determined on the facts and circumstances of each case and need not be unduly exhaustive, but rather, "simply required to justify the proposed disposition with sound business reasons." *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

26.     Here, the Debtors have concluded that, after expending significant efforts towards its dual-track restructuring, the Sale would maximize the value of their estates for the benefit of their creditors and other parties in interest.  Indeed, such conclusion was reached after a months-long marketing process whereby the WB Group, in conjunction with its advisors, engaged with

---

[6]     *See In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995) (*citing Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986)); *In re Lady H. Coal Co., Inc.*, 193 B.R. 233, 243 (Bankr. S.D.W. Va. 1996) (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997).

both strategic and financial parties who potentially were interested in participating in either a restructuring or sale of assets under section 363 of the Bankruptcy Code. Given the WB Group's inability, however, to enter into a lock-up and restructuring agreement before the deadline imposed under the DIP Facility, proceeding with the Sale was the only manner in which to maximize the value of the Assets for the benefit the of the estates. Accordingly, the Debtors contend that they have presented a sound business reason justifying the Sale.

27. *Second*, the Sale Agreement is the result of an extensive marketing process undertaken by the WB Group and its advisors and the product of arm's-length, good-faith negotiations between the parties thereto. As such, the Debtors contend that the Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. Moreover, considering that (a) the Purchaser is serving as a stalking horse whose bid is subject to higher or otherwise better offers and (b) the Bid Procedures are calculated to ensure that the Assets are sold for the maximum potential price, the Debtors believe that Sale has been proposed in good-faith.

28. *Third*, this Motion and the notice of filing thereof will be served upon all of the Debtors' creditors located in the United States and other parties in interest so as to provide such parties with (a) the terms and conditions of the Sale, (b) the time for filing objections thereto and (c) the time and place to attend a hearing to approve the Sale. As such, this Motion and the notice of the filing thereof will provide "notice that is reasonably calculated, under the circumstances, to apprise an interested party of the pendency of an action." *In re Snug Enter., Inc.,* 169 B.R. 31, 33 (Bankr. E.D. Va. 1994) (*citing Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314-15 (1950)). Accordingly, the Debtors have provided sufficient notice of the Sale.

29.     *Fourth*, the price provided in the Sale Agreement is fair, reasonable, the result of an extensive marketing process and negotiations between the Sellers and their advisors, and the Purchaser and its advisors, and is the highest and best offer received to date. Additionally, the fairness and reasonableness of the consideration to be received by the Sellers from the Purchaser, or any other potentially successful purchaser for that matter, will have been validated by a "market test" and an auction process -- the most reliable means for establishing whether a purchase price is fair and reasonable.

30.     Thus, for all of the foregoing reasons, the Debtors have determined that the Sale is in the best interests of their estates, creditors and other parties in interest, thereby satisfying the sound business purpose test and section 1520 of the Bankruptcy Code.

31.     Additionally, sections 1525 and 1527 of the Bankruptcy Code contemplate cooperation "to the maximum extent possible with the foreign court or a foreign representative," which includes, "coordination of the administration and supervision of the debtor's assets and affairs" and "approval or implementation of agreements concerning the coordination of proceedings." 11 U.S.C. §§ 1525, 1527.

32.     Given that the SISP Order has already been entered by the Canadian Court, the Foreign Representative respectfully requests that this Court recognize and give effect to the SISP Order. In addition, for the reasons set forth herein, upon the Canadian Court's entry of the Bid Procedures Order and the Sale Order, the Foreign Representative respectfully requests that this Court recognize and give effect to such orders.

### Waiver of Memorandum of Points and Authorities

33.     The Foreign Representative respectfully requests that the Court treat this Motion as a written memorandum of points and authorities or waive any requirement that this Motion be accompanied by a written memorandum of points and authorities as described in the Rule 9013-

1(G) of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia.

## Notice

34.     The Foreign Representative has provided notice of this Motion, pursuant to Bankruptcy Rule 2002(q), to: (a) the Office of the United States Trustee for the Eastern District of Virginia; (b) counsel to the Purchaser; (c) counsel to the agent under the DIP Facility; (d) counsel to the agent under the First Lien Term Loan Agreement (e) counsel to the agent under the Debtors' prepetition second lien term loan agreement; (f) counsel to counterparties under the Debtors' swap agreements; (h) the Monitor in the CCAA Cases; (i) all parties to litigation currently pending in the United States to which any Debtor is a party; and (j) vendors and suppliers of the Debtors located in the United States.   In light of the nature of the relief requested, the Foreign Representative respectfully submits that no further notice is necessary.

## No Prior Request

35.     No prior request for the relief sought herein has been made to this or any other Court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Foreign Representative respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, approving this Motion and granting such other and further relief as the Court deems just and proper.

**WHITE BIRCH PAPER COMPANY**

Dated: August 19, 2010
      Richmond, Virginia

By: */s/ Jonathan L. Hauser*
Of Counsel

Jonathan L. Hauser, Esquire
VSB No. 18688
Troutman Sanders LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
Telephone:    (757) 687-7768
Facsimile:    (757) 687-1505

- and -

Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel to the Foreign Representative*

**Exhibit A**

**Proposed Order**

Jonathan L. Hauser
VSB No. 18688
TROUTMAN SANDERS LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
Telephone:      (757) 687-7768
Facsimile:      (757) 687-1505

Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

*Counsel to the Foreign Representative*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| WHITE BIRCH PAPER COMPANY, et al.,[1] | ) | Case No. 10-10-31234 (DOT) |
| | ) | |
| Debtors in a Foreign Proceeding. | ) | Joint Administration Requested |
| | ) | |

## ORDER RECOGNIZING THE (A) SISP ORDER,
## (B) BID PROCEDURES ORDER AND (C) SALE ORDER

Upon the motion, dated August 19, 2010 (the "Motion")[2] of White Birch Paper

Company, in its capacity as the Foreign Representative of the Debtors in the Canadian

Proceeding, requesting entry of an order (this "Order") pursuant to sections 105(a), 363, 1520,

1525 and 1527 of the Bankruptcy Code, seeking recognition in the Chapter 15 Cases of (a) the

SISP Order, (b) the Bid Procedures Order and (c) the Sale Order entered by the Canadian Court;

and the Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334;

and the venue of these cases and the Motion in this district being proper pursuant to 28 U.S.C. §§

1408 and 1410(3); and consideration of the Motion and the relief requested being a core

---

[1]     The Debtors in these cases are (a) White Birch Paper Company, (b) Stadacona General Partner Inc.,
        (c) Stadacona Limited Partnership, (d) F.F. Soucy Limited Partnership, (e) F.F. Soucy Inc. & Partners, Limited
        Partnership and (f) Papier Masson Ltee.  The Debtors' U.S. service address is 80 Field Point Road, Greenwich,
        Connecticut 06830.

[2]     Capitalized terms used and not defined herein shall have the meaning ascribed to such terms in the Motion.

proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that due and proper notice of the Motion has been provided and no other or further notice need be provided; and a hearing (the "Hearing") having been held to consider the relief requested in the Motion and upon the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is consistent with the purpose of Chapter 15 of the Bankruptcy Code and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, IT IS HEREBY ORDERED THAT:

1.  The Motion is granted in its entirety.

2.  The Court recognizes the SISP Order, attached hereto as **Exhibit 1**, which is hereby given full force and effect in the United States.

3.  The Court recognizes the Bid Procedures Order, attached hereto as **Exhibit 2**, which is hereby given full force and effect in the United States.

4.  The Court recognizes the Sale Order, attached hereto as **Exhibit 3**, which is hereby given full force and effect in the United States.

5.  The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.


Dated: _____, 2010        _____
        Richmond, Virginia             Chief Judge Douglas O. Tice, Jr.
                                        United States Bankruptcy Judge

I ASK FOR THIS:

*/s/ Jonathan L. Hauser*
Jonathan L. Hauser
VSB No. 18688
**TROUTMAN SANDERS LLP**
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
Telephone:     (757) 687-7768
Facsimile:     (757) 687-1505

- and -

Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
Richard M. Cieri (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

*Counsel to the Foreign Representative*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Jonathan L. Hauser*

**Exhibit 1** to **Exhibit A**

**SISP Order**

SUPERIOR COURT
(Commercial Division)
The *Companies' Creditors Arrangement Act*

MONTREAL, this 29th day of April, 2010

IN THE PRESENCE OF:
THE HONOURABLE ROBERT MONGEON, J.S.C.

IN THE MATTER OF THE PLAN OF ARRANGEMENT AND COMPROMISE OF:

WHITE BIRCH PAPER HOLDING COMPANY

-and-

WHITE BIRCH PAPER COMPANY

-and-

STADACONA GENERAL PARTNER INC.

-and-

BLACK SPRUCE PAPER INC.

-and-

F.F. SOUCY GENERAL PARTNER INC.

-and-

3120772 NOVA SCOTIA COMPANY

-and-

ARRIMAGE DE GROS CACOUNA INC.

-and-

**PAPIER MASSON LTÉE**

**Debtors**

-and-

**ERNST & YOUNG INC.**

**Monitor**

-and-

**STADACONA LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY, INC. & PARTNERS, LIMITED PARTNERSHIP**

**Mises en Cause**

---

## ORDER APPROVING THE SALE AND INVESTOR SOLICITATION PROCESS

**CONSIDERING** the Debtors' *"Motion to Approve a Sale and Investor Solicitation Process"* (the **"Motion"**) and its supporting exhibits;

**CONSIDERING** the representations made by counsel; and

**GIVEN** the provisions of the CCAA;

**WHEREFORE, THE COURT:**

[1]     **GRANTS** the present *"Motion to Approve a Sale and Investor Solicitation Process"*;

[2]   **APPROVES** the Sale and Investor Solicitation Process procedures contained in Exhibit P-1, as amended, attached herewith;

[3]   **AUTHORIZES** the Debtors and Mises en Cause, in conjunction with the Monitor and other advisors, to carry out the Sale and Investor Solicitation Process procedures;

**THE WHOLE WITHOUT COSTS.**

**MONTREAL**, this 29th day of April, 2010

_____
**THE HONOURABLE ROBERT MONGEON, J.S.C.**

COPIE CONFORME

Greffier adjoint

# FORM OF PROCEDURES FOR THE
# SALE AND INVESTOR SOLICITATION PROCESS

On February 24, 2010 (the "Petition Date"), White Birch Paper Holding Company, White Birch Paper Company, Stadacona General Partner Inc., Black Spruce Paper Inc., F.F. Soucy General Partner Inc., 3120772 Nova Scotia Company, Arrimage de Gros Cacouna Inc., Papier Masson Ltée, Stadacona L.P., F.F. Soucy L.P. and F.F. Soucy, Inc. & Partners, L.P. (the "Canadian Debtors") commenced proceedings (the "CCAA Proceedings") seeking relief under the *Companies' Creditors Arrangement Act* (the "CCAA") before the Superior Court of Québec, Commercial Division, in Montreal, Canada (the "CCAA Court"). On the same day, Bear Island Paper Company, L.L.C. (the "U.S. Debtor" and, together with the Canadian Debtors, the "WB Group") commenced a proceeding (the "U.S. Proceeding") under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (the "U.S. Bankruptcy Court," and together with the CCAA Court, the "Courts"). The Canadian Debtors have also filed petitions and related pleadings under Chapter 15 in the U.S. Bankruptcy Court and, on March 26, 2010, the U.S. Bankruptcy Court entered an order recognizing the CCAA Proceedings as a "foreign main proceeding."

Immediately prior to the Petition Date, the WB Group finalized the terms of a $140,000,000 Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement (the "White Birch DIP Facility"). On February 24, 2010, the CCAA Court entered an order granting approval of the White Birch DIP Facility. On February 26, 2010, the U.S. Bankruptcy Court entered an order granting interim approval, and on March 31, 2010, the U.S. Bankruptcy Court entered an order granting final approval of the White Birch DIP Facility.

Pursuant to its approved terms, the White Birch DIP Facility prescribes that the WB Group shall meet certain milestones as part of the development of a joint plan of reorganization (the "Plan of Reorganization") in the CCAA Proceedings and the U.S. Proceeding. In parallel, the White Birch DIP Facility prescribes an alternative sale and investor solicitation process (the "SISP") whereby the WB Group will seek to sell all or substantially all of its assets (the "Assets") under the supervision of the Courts. On April 23, 2010 the Canadian Debtors filed a motion with the CCAA Court seeking an order for approval of the SISP and the procedures set forth herein (the "SISP Procedures"). On April 19, 2010, the U.S. Debtor filed a motion with the U.S. Bankruptcy Court for an order authorizing and approving the SISP Procedures.

On April ___, 2010, following hearings of the Courts, the Courts each entered an order (together, the "SISP Order") approving the SISP and the SISP Procedures. The SISP Order, SISP and the SISP Procedures are to be followed with respect to the SISP for the WB Group.

## Summary of the Solicitation Process

1.     The SISP Procedures set forth herein describe, among other things, the Assets available for sale, the manner in which prospective bidders will be solicited, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become qualified bids, the receipt and negotiation of bids received (collectively, the "Solicitation Process"), and the timeframe for additional steps which shall be carried out pursuant to a further order of the Courts, notably the

conduct of any subsequent Auction (as defined below), the ultimate selection of a successful bidder, and the CCAA Court and U.S. Bankruptcy Court's approval thereof.

2.  WB Group, in consultation with its financial and legal advisors and Ernst & Young Inc. (the "Monitor") shall conduct the SISP Procedures and the Solicitation Process as outlined herein. Certain stages of the SISP Procedures may be conducted by the WB Group simultaneous to the preparation, solicitation or confirmation of a Plan of Reorganization. In addition, the closing of any sale may involve additional intermediate steps or transactions to facilitate consummation of such sale, including the additional Court filings and/or merger or other corporate transactions of subsidiaries and affiliates of the WB Group.

3.  The following is a brief summary of the Solicitation Process and the timeline associated with the Solicitation Process (each step of which is described in greater detail below):

(a)  The Solicitation Process will commence in April 2010 with the preparation by the WB Group, in conjunction with its advisors, including Lazard Freres & Co. LLC ("Lazard"), of a list of potential bidders (the "Potential Bidders") for the assets of the WB Group (the "Assets"). Such list will include both strategic and financial parties who, in Lazard's reasonable professional judgment, may be interested in acquiring the Assets. Concurrently, the WB Group and Lazard will prepare an initial offering summary (the "Teaser Letter") notifying Potential Bidders of the existence of the Solicitation Process and inviting the Potential Bidders identified to express their interest in making an offer to acquire all or substantially all of the Assets.

(b)  On or prior to May 3, 2010, Lazard shall undertake to distribute to Potential Bidders the Teaser Letter as well as a draft confidentiality agreement (a "Confidentiality Agreement") that is satisfactory to the WB Group, its advisors and the Monitor, and which shall inure to the benefit of any purchaser of the Assets.

(c)  Beginning on May 3, 2010 and until no later than June 15, 2010, Lazard shall undertake to distribute to all Phase 1 Qualified Bidders (as defined below) a detailed memorandum (the "Confidential Information Memorandum") describing the opportunity to acquire all or substantially all of the Assets.

(d)  By no later than June 15, 2010 at 12:00 pm (prevailing Eastern Time), any Phase 1 Qualified Bidder interested in bidding on the Assets must submit to the Notice Parties (as defined below) an Initial Non-Binding Letter of Interest (as defined below) that identifies, inter alia, an initial purchase price range for the Assets. As promptly as possible thereafter, the WB Group and its advisors will notify all Phase 1 Qualified Bidders whether they have been selected as Phase 2 Qualified Bidders (as defined below).

(e)  The Phase 2 Qualified Bidders will thereafter be invited to complete a due diligence process with regard to the Assets. The parameters of such due diligence process are set out at Paragraph 11 below.

(f)   By no later than July 15, 2010 at 12:00 pm (prevailing Eastern Time), any Phase 2 Qualified Bidder must submit a Phase 2 Qualified Bid (as defined below) that complies with the requirements of Paragraph 13 below.

(g)   By no later than August 2, 2010, after comprehensive evaluation of the Phase 2 Qualified Bidders and Phase 2 Qualified Bids and in consultation with their advisors, the WB Group shall, in its sole discretion, select a Stalking Horse Bidder (as defined below) and file motions with the Courts seeking approval of the Stalking Horse Documentation (as defined below), the sale of the Assets, bidding procedures and a scheduling of the Auction and sale hearing.

## Assets to Be Sold

4.      The WB Group is offering for sale all or substantially all of the Assets, as set forth in the Confidential Information Memorandum to be made available by the WB Group to Potential Bidders that have submitted the Participation Documents described in Paragraph 7 below and otherwise qualify as Phase 1 Qualified Bidders (as defined below).

## "As Is, Where Is"

5.      The sale of the Assets will be on an "as is, where is" basis and without surviving representations, warranties or indemnities of any kind, nature or description by the WB Group, the Monitor or any of their respective directors, officers, employees, agents, estates, advisors, professionals or otherwise, except to the extent set forth in the relevant sale agreement ultimately approved by the Courts.

## Free Of Any And All Claims And Interests

6.      If approved by the respective Courts, after notice and a hearing, all of the rights, title and interests of the WB Group in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all security, charges, pledges, liens, encumbrances, claims or other restrictions thereon and there against (collectively, the "Charges") as permitted by section 36(6) of the CCAA and, with respect to Assets owned by the U.S. Debtor, the U.S. Debtor will, subject to approval by the U.S. Bankruptcy Court and after notice and a hearing, request authorization to sell such Assets pursuant to, *inter alia*, sections 363 and 365 of the Bankruptcy Code, with a request that such Charges attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof).

## Phase 1 Participation Requirements

7.      Unless otherwise determined by the WB Group, in order to participate in the Solicitation Process, each Potential Bidder must deliver to the Notice Parties (as defined below, at the addresses provided below) the following documents (such documents, the "Participation Documents"):

(a)   an executed Confidentiality Agreement;

(b)   current audited financial statements and latest unaudited financial statements of the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of

3

acquiring the Assets, current audited financial statements and latest unaudited financial statements of the equity holders or sponsors of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the WB Group and the Notice Parties to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the sale of the Assets (the "Sale");

(c)    a letter setting forth the identity of the Potential Bidder (and, if applicable, its sponsor), the contact information for such Potential Bidder and its principal advisors, and full disclosure of any pre-petition or post-petition affiliations that the Potential Bidder has or may have with (i) the WB Group, (ii) any affiliates of the WB Group, (iii) any creditor of the WB Group, (iv) any holder of equity securities of the WB Group and (v) any current or former officers, managers or directors of the WB Group or its affiliates; and

(d)    any other information reasonably requested by Lazard, in consultation with the Monitor and the WB Group.

### Determination of Phase 1 Qualified Bidders and
### Distribution of Confidential Information Memoranda

8.    As promptly as practicable after a Potential Bidder delivers the Participation Documents, a Potential Bidder that delivers the required Participation Documents, whose financial information and credit quality support or enhancement demonstrate to the WB Group's satisfaction the financial capability of the Potential Bidder to consummate the sale, that has executed a Confidentiality Agreement, and that the WB Group determine in its reasonable business judgment, after consultation with its advisors and the Monitor, is likely (based on availability of financing, experience and other considerations, including regulatory approvals) to be able to consummate the sale will be deemed a "Phase 1 Qualified Bidder." Contemporaneous with such determination, Lazard will undertake to provide the Phase 1 Qualified Bidder with a Confidential Information Memorandum. All Phase 1 Qualified Bidders will be invited to submit an Initial Non-Binding Letter of Interest pursuant to the terms of Paragraph 9 below.

### Submission of Initial Non-Binding Letters of Interest
### and Determination of Phase 2 Qualified Bidders

9.    A Phase 1 Qualified Bidder that desires to participate in due diligence shall deliver by no later than June 15, 2010 at 12:00 pm (prevailing Eastern Time) written copies of a non-binding indication of interest (an "Initial Non-Binding Letter of Interest") to the Notice Parties. All Initial Non-Binding Letters of Interest shall identify (i) the purchase price for the Assets (including liabilities to be assumed by the Phase 1 Qualified Bidder), (ii) the structure and financing of the transaction, including, but not limited to, the sources of financing for the purchase price, evidence of the availability of such financing and the steps necessary and associated timing to obtain the financing and any related contingencies, as applicable), (iii) an indication of the allocation of purchase price between the Canadian Debtors and the U.S. Debtor, (iv) conditions of employment to the extent employment will be offered to employees, including

any incentive plans, (v) any anticipated corporate, shareholder, internal or regulatory approvals required to close the transaction and the anticipated time frame and any anticipated impediments for obtaining such approvals, (vi) additional due diligence required or desired to be conducted, (vii) any conditions to closing that the Phase 1 Qualified Bidder wishes to impose, and (viii) any other terms or conditions of the purchase proposal which the Phase 1 Qualified Bidder believes are material to the transaction.

10.     As promptly as practicable, if a Phase 1 Qualified Bidder delivers an Initial Non-Binding Letter of Interest that the WB Group, after consultation with its advisors and the Monitor, determines in its reasonable business judgment is reasonably likely (based on the terms and conditions described in the Non-Binding Letter of Interest and other considerations, including regulatory approvals) to result in a sale, such Phase 1 Qualified Bidder will be deemed a "Phase 2 Qualified Bidder." Contemporaneous with such determination, such Phase 2 Qualified Bidder will be invited to complete a due diligence process pursuant to Paragraph 11 below.

## Due Diligence

11.     The WB Group may in its reasonable business judgment, and subject to competitive and other business and legal considerations, afford each Phase 2 Qualified Bidder such due diligence access to materials and information relating to the Assets as the WB Group deem appropriate. Due diligence access may include management presentations as may be scheduled by the WB Group, access to electronic data rooms, property tours, and other matters which a Phase 2 Qualified Bidder may reasonably request and as to which the WB Group, in its reasonable business judgment, may agree. The WB Group will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such parties.

12.     Neither the WB Group nor any of its affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Phase 2 Qualified Bidders. The Monitor, Lazard and the WB Group make no representation or warranty as to the information or the materials provided, except, in the case of the WB Group, to the extent contemplated under any definitive sale agreement with a Successful Bidder executed and delivered by the applicable WB Group entities.

## Phase 2 Qualified Bids

13.     A bid will be considered a "Phase 2 Qualified Bid" only if the bid is submitted by a Phase 1 Qualified Bidder, pursuant to the previous paragraph and complies with all of the following so as to be received **not later than July 15, 2010** at 12:00 pm (prevailing Eastern Time):

(a)     it states that the applicable Phase 2 Qualified Bidder offers to purchase all or substantially all of the Assets upon the terms and conditions substantially as set forth in the form of purchase agreement developed by the WB Group in consultation with its advisors and the Monitor (the "Purchase Agreement"), including, without limitation, with respect to certainty and timing of closing, or

pursuant to an alternative structure (including, without limitation, an offer conditioned upon confirmation of a Plan of Reorganization proposed by the WB Group either individually or in collaboration with such Phase 2 Qualified Bidder) or upon alternative terms and conditions that the WB Group determine are no less favorable than the terms and conditions of the Purchase Agreement;

(b) it includes a letter stating that the Phase 2 Qualified Bidder's offer is irrevocable at least until the completion of the Auction;

(c) it includes a duly authorized and executed Purchase Agreement, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto and, to the extent required by the terms and conditions of such bid, any ancillary agreements as described in the Purchase Agreement with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and ancillary modifications to the Purchase Agreement ("Marked Agreements"), and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the sale by the CCAA Court and U.S. Bankruptcy Court, proposed by the Phase 2 Qualified Bidder;

(d) it provides a full description of all applicable proposed expense reimbursements and break-up fees that would be applicable were the Phase 2 Qualified Bidder to be selected as a Stalking Horse Bidder (as defined below);

(e) it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the sale, that will allow the WB Group, is advisors and the Monitor to make a reasonable determination as to the Phase 2 Qualified Bidder's financial and other capabilities to consummate the sale contemplated by the Marked Agreements and the Marked Ancillary Agreements;

(f) it is not conditioned on (i) the outcome of unperformed due diligence by the Phase 2 Qualified Bidder (and includes an acknowledgement and representation that the Phase 2 Qualified Bidder has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer) or (ii) obtaining financing;

(g) it fully discloses the identity of the entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(h) it includes an acknowledgment and representation that the Phase 2 Qualified Bidder will assume the WB Group's obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreement (or identifies with particularity which of such contracts and leases of the WB Group that the Phase 2 Qualified Bidder wishes not to assume, or alternatively which

additional executory contracts or unexpired leases of the WB Group that the Phase 2 Qualified Bidder wishes to assume), contains full details of the Phase 2 Qualified Bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)    it includes an acknowledgement and representation that the Phase 2 Qualified Bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid and (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreement or the Marked Ancillary Agreements;

(j)    it includes evidence, in form and substance reasonably satisfactory to the WB Group, of authorization and approval from the Phase 2 Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)    it includes evidence, in form and substance reasonably satisfactory to the WB Group, of compliance or anticipated compliance with all regulatory approvals (including, if applicable, anti-trust and Investment Canada approvals), the anticipated time frame and any anticipated impediments for obtaining such approvals;

(l)    it contains full details of the proposed number of employees of the WB Group who will become employees of the Phase 2 Qualified Bidder and any proposed measures associated with the continued employment and associated with the employment of all employees who will become employees of the Phase 2 Qualified Bidder;

(m)    it includes evidence of the Phase 2 Qualified Bidder's ability to comply with Section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Phase 2 Qualified Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by or subleased to the Phase 2 Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)    it identifies the Phase 2 Qualified Bidder's principal advisors;

(o)    it contains other information reasonably requested by the WB Group; and

(p)    it is received by July 15, 2010 at 12:00 pm (prevailing Eastern Time).

14. The WB Group will determine, in their reasonable business judgment whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Phase 2 Qualified Bids. The WB Group shall notify any Phase 2 Qualified Bidders in writing as to whether or not their bid constitutes a Phase 2 Qualified Bid promptly after receipt of the bid.

## Evaluation of Competing Bids and Selection of "Stalking Horse"

15. A Phase 2 Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to the sale proposed by the Phase 2 Qualified Bidder, the proposed revisions to the Purchase Agreement, the effect of the proposed sale on the value of the ongoing businesses of the WB Group (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the proposed Sale (including regulatory or other approvals required to close the Sale), any assets excluded from the bid, the estimated number of employees of the WB Group to be offered post-closing employment by the Phase 2 Qualified Bidder and any proposed measures associated with the continued employment of all employees who will become the employees of the Phase 2 Qualified Bidder, the transition services required from the WB Group post-closing and any related restructuring costs, and the likelihood and timing of consummating such Sale, each as determined by the WB Group, in consultation with its advisors and the Monitor. The WB Group reserves the right, taking into account all other factors set forth herein (including execution risk), to choose a successful bidder that did not offer the highest purchase price for the Assets. Following their review of the Phase 2 Qualified Bids and in consultation with its advisors and the Monitor, the WB Group shall, in its sole discretion, select a Phase 2 Qualified Bidder to serve as the stalking horse bidder (the "Stalking Horse Bidder"). The WB Group shall (i) execute definitive transaction documentation (the "Stalking Horse Documentation"), subject to CCAA Court and U.S. Bankruptcy Court approval and (ii) file motions with the Courts to approve the Stalking Horse Documentation by **no later than August 2, 2010**.

## No Qualified Bids

16. If the WB Group does not receive any Phase 2 Qualified Bids or an insufficient number of Phase 2 Qualified Bids, the WB Group reserves the right, in consultation with its advisors to (i) extend the deadlines set forth in the SISP Procedures without further notice, and (ii) withdraw from sale, in whole or in part, any Assets at any time and to make subsequent attempts to market the same.

## Additional Steps

17. As noted above, the SISP is to be conducted pursuant to the terms of the White Birch DIP Facility. By virtue thereof, the SISP constitutes an alternative to and shall be carried out in parallel to a process aimed at filing a joint Plan of Reorganization. The WB Group must file such a joint Plan of Reorganization on or prior to June 30, 2010 under the terms of the White Birch DIP Facility. If this is done, the SISP process shall be discontinued and all Phase 2 Qualified Bidders shall be informed thereof. However, should no joint Plan of Reorganization

be filed by that date, pursuant to the White Birch DIP Facility, the WB Group must pursue the SISP process and must complete certain additional steps leading to the sale of the Assets.

18. In particular, pursuant to the terms of the White Birch DIP Facility, once a Stalking Horse Bidder has been identified, as noted above, the WB Group must seek and obtain approvals of the Courts of the Stalking Horse Documentation.

19. Concurrently, the terms of the White Birch DIP Facility provide that (i) the WB Group must obtain approval of the Courts for bidding procedures ending in an auction of all the Assets (the "Auction"); (ii) details of the bidding procedures and the Auction shall be set out in forthcoming documentations submitted to the Courts prior to the August 2, 2010 deadline mentioned above; (iii) the Courts must issue a bidding procedures order (the "Bidding Procedures Order") on or prior to August 16, 2010; and (iv) the Auction must then be held on or prior to August 23, 2010.

20. At the conclusion of the Auction, the terms of the White Birch DIP Facility provide that (i) a winning bidder shall have been identified (the "Winning Bidder"); (ii) the WB Group shall request that, by August 26, 2010, orders be entered by the Courts approving the sale of the Assets to the Winning Bidder(s); and (iii) a transaction consummating the winning bid will then be concluded, which transaction shall be fully consummated on or prior to September 13, 2010, or, if the Winning Bidder is not the Stalking Horse Bidder and the only condition that has not been satisfied or waived is applicable regulatory approval, September 27, 2010.

## Notice Parties

21. As used herein, the "**Notice Parties**" include all of the following: (i) White Birch Paper Company, Attn: Jay Epstein, Vice President – Finance, Treasurer & Secretary, 80 Field Point Road, Greenwich, CT 06830, Facsimile: (203) 661-3349; (ii) Debtors' U.S. counsel: Kirkland & Ellis, Attn: Christopher Marcus, 601 Lexington Avenue, New York, NY 10022, Facsimile: (212) 446-4900; (iii) Debtors' Canadian counsel: Stikeman Elliott LLP, Attn. Kevin Kyte & Jean Fontaine, 1155 René-Lévesque Blvd. W., Suite 4000, Montreal, Quebec, Canada, H3B 3V2, Facsimile: (514) 397-3222; (iv) Debtors' financial advisors: Lazard Frères & Co., Attn: Stephen Goldstein, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-8670 and (v) the Monitor: Ernst & Young Inc., Attn: Martin Rosenthal, 800 René-Lévesque Blvd. West, Suite 1900 Montreal, Quebec, Canada H38 1X9, Facsimile: (514) 879-2600.

## Reservation of Rights

22. The WB Group, after consultation with its advisors: (a) may reject, at any time, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the CCAA, the SISP Procedures, or any other orders applicable to one or more Debtors, or the terms and conditions of the Sale or (iii) contrary to the best interests of the WB Group, their estates, and stakeholders as determined by the WB Group; (b) may impose additional terms and conditions and otherwise seek to modify the SISP Procedures at any time; (c) may withdraw from sale any Assets at any time and make subsequent attempts to market the same; (d) may accept bids not in conformity with the SISP Procedures to the extent the WB

Group determines, in their reasonable business judgment, that doing so would benefit the Debtors' estates; and (e) may reject all bids.

23. These SISP Procedures do not, and shall not be interpreted to, create any contractual or other legal relationship between any member of the WB Group and any Potential Bidder, Phase 1 Qualified Bidder or Phase 2 Qualified Bidder, other than as specifically set forth in definitive agreements that may be signed with the WB Group.

### Credit Bid

24. Notwithstanding anything herein to the contrary, including without limitation, the bidding requirements herein, the agent under the White Birch DIP Facility (the "DIP Agent") and the agent to the WB Group's first lien term loan lenders (the "First Lien Term Agent"), on behalf of the lenders under White Birch DIP Facility and the WB Group's first lien term loan lenders, respectively, shall be deemed Qualified Bidders and any bid submitted by such agents on behalf of the respective lenders in respect of all or a portion of the Assets shall be deemed both Phase 1 Qualified Bids and Phase 2 Qualified Bids. The DIP Agent and First Lien Term Agent, on behalf of the lenders under the White Birch DIP Facility and the WB Group's first lien term loan lenders, respectively, shall be permitted, in their sole discretion, to credit bid up to the full amount of any allowed secured claims under the White Birch DIP Facility and the first lien term loan agreement, respectively, to the extent permitted under section 363(k) of the Bankruptcy Code and other applicable law.

**Exhibit 2** to **Exhibit A**

**Bid Procedures Order**

CANADA

SUPERIOR COURT
(Commercial Division)
The *Companies' Creditors
Arrangement Act*

PROVINCE OF QUÉBEC
DISTRICT OF MONTRÉAL
No.: 500-11-038474-108

MONTRÉAL, this _____ day of
_____, 2010

IN THE PRESENCE OF:
THE HONOURABLE

_____,
J.S.C.

IN THE MATTER OF THE PLAN OF
ARRANGEMENT AND
COMPROMISE OF:

WHITE BIRCH PAPER HOLDING
COMPANY

-and-

WHITE BIRCH PAPER COMPANY

-and-

STADACONA GENERAL PARTNER
INC.

-and-

BLACK SPRUCE PAPER INC.

-and-

F.F. SOUCY GENERAL PARTNER
INC.

-and-

3120772 NOVA SCOTIA COMPANY

-and-

ARRIMAGE DE GROS CACOUNA
INC.

-and-

**PAPIER MASSON LTÉE**

**Debtors**

-and-

**ERNST & YOUNG INC.**

**Monitor**

-and-

**STADACONA LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY, INC. & PARTNERS, LIMITED PARTNERSHIP**

**Mises en Cause**

---

**ORDER APPROVING THE STALKING HORSE BIDDER, APPROVING AN ASSET SALE AGREEMENT, APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL THE WB GROUP'S ASSETS AND SCHEDULING AN AUCTION AND SALE HEARING**

**CONSIDERING** the Debtors' *"Motion to Approve a Stalking Horse Bidder, to Approve an Asset Sale Agreement, to Approve Bidding Procedures for the Sale of Substantially All the WB Group's Assets and to Schedule an Auction and Sale Hearing"* (the **"Motion"**); and its supporting exhibits;

CONSIDERING the submissions of counsel;

GIVEN the provisions of the Initial Order granted by this Court in this matter on February 24th, 2010 (the "**Initial Order**");

GIVEN the provisions of the order of this Court approving the Sales and Investor Solicitation Process; and

GIVEN the provisions of the *Companies' Creditors Arrangement Act*, (R.S.C., 1985, c. C-36) as amended (the "**CCAA**");

**WHEREFORE, THE COURT:**

[1] **GRANTS** the present Motion;

[2] **DECLARES** sufficient the service and notice of the present Motion;

[3] **APPROVES** the Monitor's Report, Exhibit SM-1;

[4] **APPROVES** as the Stalking Horse Agreement, the Asset Sale Agreement dated August 10th, 2010, Exhibit SM-2, by and between White Birch Paper Company (together with certain subsidiaries) and BD – White Birch Investment LLC (the "**Sale Agreement**"), including, without limitation, the obligations of the Sellers to pay the Break-Up Fee and the Expense Reimbursement (as such terms are defined in the Sale Agreement) to the Purchaser on the terms and conditions set forth in the Sale Agreement;

[5] **APPROVES** the bidding procedures, as set out at Exhibit SM-3 (the "**Bidding Procedures**"), including, without limitation, the section entitled *"Break-Up Fee and Expense Reimbursement"*;

[6] **ORDERS** that the capitalized terms used herein but not defined shall have the meanings ascribed to them in the Bidding Procedures or, if not defined therein, in the Initial Order;

[7]     **DECLARES** that BD White Birch Investment LLC ("**BD**") shall be the stalking horse bidder for the purposes of the competitive bidding process set out in the Bidding Procedures, Exhibit SM-3;

[8]     **AUTHORIZES AND ORDERS** the WB Group, its advisors and the Monitor to conduct the competitive bidding process set out in the Bidding Procedures, Exhibit SM-3, in accordance with the Bidding Procedures;

[9]     **ORDERS** that, to the extent a Qualified Bid, as defined in the Bidding Procedures, Exhibit SM-3, other than the bid received from BD White Birch Investment LLC, is received by no later than 5:00 pm (Eastern time) on August 30th, 2010, an auction for the Assets of the WB Group shall be held at the offices of Kirkland & Ellis, 601 Lexington Avenue, New York, New York, United States of America, 10022, beginning at 10:00 am (Eastern time) on September 1st, 2010; or at such later time or other place as the WB Group shall notify all Qualified Bidders in accordance with the terms of the Bidding Procedures;

[10]    **AUTHORIZES AND ORDERS** the WB Group and its advisors to carry out any such Auction in accordance with the Bidding Procedures;

[11]    **DECLARES** that a hearing shall take place before the Superior Court of Quebec, Commercial Division, on or prior to September 8th, 2010 in order to authorize and approve the sale of the WB Group's Assets, pursuant to the terms set out in the Asset Purchase Agreement, Exhibit SM-2, or pursuant to the terms of an alternative transaction with the winning bidder at the auction, as the case may be (the "**Sale Hearing**");

[12]  **ORDERS** that, in the event that no Qualified Bids other than the Qualified Bid submitted by BD are received pursuant to the terms of the Bidding Procedures, that the WB Group is authorized and ordered to (i) cancel the Auction and (ii) seek entry of the Canadian Sale Order (as defined in the Sale Agreement) in accordance with the Bidding Procedures;

[13]  **DECLARES** that, pursuant to the terms of the Sale Agreement and as security for the Debtors' and the Mises en Cause's obligation to pay the Break-Up Fee and the Expense Reimbursement to the Purchaser, as hereby approved under the terms and conditions set forth in the Sale Agreement and the Bidding Procedures, the Purchasers are hereby granted a hypothec on, mortgage of, lien on and security interest in the Property to the extent of the aggregate amount of the Break-Up Fee and the Expense Reimbursement (being seven million five hundred thousand United States dollars (US $7,500,000.00)), which charge shall be subordinate to the Administration Charge, the D&O Charge and the Interim Financing Charge, but shall otherwise be, and be deemed to be, an additional "CCAA Charge" under, and for the purposes of, the provisions of the Initial Order concerning the CCAA Charges;

[14]  **DECLARES** that, in the event that BD submits the Winning Bid (as defined in the Bidding Procedures), the provisions of the ASA that contemplate that at Closing the $10 million D&O Charge (as defined in the Initial Order) and the $3 million Administrative Charge (as defined in the Initial Order) will be discharged and expunged and replaced, in effect, with the $10 million letter of credit and the $3 million Wind-Down Amount, pursuant to the Canadian Sale Order (as defined in the ASA) and as provided for under Sections 5.2(g) and 5.18 of the ASA, respectively, are hereby approved;

[15]  **ORDERS** that, in connection with the Bidding Procedures and pursuant to clause 7(3)(c) of the Personal Information Protection and Electronic Documents Act (Canada), the Debtors and the Mises en Cause are authorized and permitted to disclose personal information of identifiable individuals to Qualified Bidders and their advisors, but only to the extent required in connection with the terms of the Bidding Procedures and the bidding and sale process to be conducted thereunder.  Each such Qualified Bidder shall maintain and protect the privacy of such information and limit the use of such information to its participation in the Sale and, if it does not complete the Sale, shall return all such information to the Debtors and the Mises en Cause, or in the alternative, destroy all such information;

[16]  **REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States or elsewhere, including the United States Bankruptcy Court for the Eastern District of Virginia, to give effect to this Order and to assist the Debtors, the Mises en Cause and the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Debtors, the Mises en Cause and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Debtors, the Mises en Cause and the Monitor and their respective agents in carrying out the terms of this Order;

**THE WHOLE _____ COSTS.**

> **MONTRÉAL,** this _____ day of
> _____, 2010

_____

**THE HONOURABLE**
_____,
**J.S.C.**

**Exhibit 3** to **Exhibit A**

**Sale Order**

CANADA

SUPERIOR COURT
(Commercial Division)
The *Companies' Creditors
Arrangement Act*

PROVINCE OF QUÉBEC
DISTRICT OF MONTRÉAL
No.: 500-11-038474-108

MONTRÉAL, this _____ day of
_____, 2010

IN THE PRESENCE OF:
THE HONOURABLE ROBERT
MONGEON, J.S.C.

IN THE MATTER OF THE PLAN OF
ARRANGEMENT                AND
COMPROMISE OF:

WHITE BIRCH PAPER HOLDING
COMPANY

-and-

WHITE BIRCH PAPER COMPANY

-and-

STADACONA GENERAL PARTNER
INC.

-and-

BLACK SPRUCE PAPER INC.

-and-

F.F. SOUCY GENERAL PARTNER
INC.

-and-

3120772 NOVA SCOTIA COMPANY

-and-

ARRIMAGE DE GROS CACOUNA
INC.

-and-

**PAPIER MASSON LTÉE**

**Debtors**

-and-

**ERNST & YOUNG INC.**

**Monitor**

-and-

**STADACONA LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY, INC. & PARTNERS, LIMITED PARTNERSHIP**

**Mises en Cause**

---

## APPROVAL AND VESTING ORDER

**CONSIDERING** the Debtors' "*Motion to Approve the Sale of Substantially All the WB Group's Assets*" (the "**Motion**") in respect of a sale transaction contemplated by an asset sale agreement (the "**Sale Agreement**") dated August 10, 2010 amongst White Birch Paper Company and the other entities identified therein as sellers (collectively, the "**Sellers**"), as sellers, and BD White Birch Investment LLC (the "**Purchaser**") and such other Person(s) as it may designate (each, a

**"Designated Purchaser"**), as purchaser, for the sale of substantially all of the Assets of the Sellers, and all of its terms, conditions, schedules, exhibits and related and ancillary agreements (collectively, the **"Transaction"**), and the Report dated August 10, 2010 (the **"Report"**) of Ernst & Young Inc. in its capacity as the monitor (the **"Monitor"**) of the Debtors and the Mises en Cause;

**CONSIDERING** the representations made by counsel; and

**GIVEN** the provisions of the CCAA and, in particular, Section 36 thereof;

**WHEREFORE, THE COURT:**

[1] **GRANTS** the Motion;

[2] **DECLARES** sufficient the service and notice of the Motion and hereby dispenses with further service thereof;

[3] **ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Sale Agreement;

[4] **ORDERS AND DECLARES** that the Sale Agreement and all of its terms and conditions (including all schedules and exhibits thereto and related and ancillary agreements and all schedules and exhibits thereto) and the Transaction are hereby fully and finally approved. The execution, delivery and performance of the Sale Agreement and the Transaction (with any such amendments as the parties thereto may agree to in accordance with the terms thereof) by the Debtors and the Mises en Cause party thereto is hereby authorized and approved, and the Debtors and the Mises en Cause and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the

conveyance of the Debtors' and the Mises en Cause's right, title and interest in and to the Assets to the Purchaser or a Designated Purchaser;

[5]   **ORDERS** that the Debtors and the Mises en Cause are authorized and directed to perform their obligations under the Sale Agreement and in respect of the Transaction;

[6]   **ORDERS AND DECLARES** that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "**Monitor's Certificate**"), all of the Debtors' and the Mises en Cause's right, title, benefit and interest in and to the Assets shall vest absolutely in the Purchaser or a Designated Purchaser, free and clear of and from any and all right, title, interest, security interests (whether contractual, statutory, or otherwise), hypothecs (legal or contractual), prior claims, mortgages, pledges, deeds of trust, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens (statutory or otherwise), executions, levies, charges, or other financial or monetary claims, options, rights of first offer or first refusal, real property licenses, encumbrances, conditional sale arrangements, leasing agreements or other similar restrictions of any kind, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured, legal, possessory or otherwise (collectively, the "**Claims**"), including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Order of the Honourable Robert Mongeon, J.S.C. dated February 24, 2010 or any other Order of this Honourable Court in these proceedings; (ii) all charges, security interests or claims evidenced by registrations pursuant to the Registre des droits personnels et réels mobiliers (Québec), the Personal Property Security Act (Nova Scotia), the *Bank Act (Canada)* or any other personal property registry system, or recorded with the Canadian Intellectual Property Office

pursuant to the Trade-marks Act (Canada); (iii) all Excluded Liabilities; and (iv) all charges, security interests, liens or other claims specified on Schedule "●" (all of which are collectively referred to as the "**Encumbrances**", but excluding Permitted Encumbrances (other than those Permitted Encumbrances specified in clause (i) of the definition of Permitted Encumbrances in the Sale Agreement and any other Permitted Encumbrances specifically contemplated to be discharged by this Order)). For greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Assets shall, upon delivery of the Monitor's Certificate, be and are hereby expunged and discharged as against the Assets. Counsel for the Purchaser and any agents appointed by such counsel may, immediately following the Closing of the Transaction, proceed with the discharge of such Claims and Encumbrances including, without limitation, the electronic discharge of any financing statements, UCC registrations, mortgages or other registrations in respect thereof;

[7]     **ORDERS** that for the purposes of determining the nature and priority of Claims and Encumbrances, the proceeds from the sale of the Debtors' and the Mises en Cause's right, title and interest in and to the Assets (other than the Wind-Down Amount and the Reserve Payment Amount) shall stand in the place and stead of the Assets, and that from and after the delivery of the Monitor's Certificate, all Claims and Encumbrances (other than the D & O Charge and the Administrative Charge) shall attach to the proceeds from the sale of the Debtors' and the Mises en Cause's right, title and interest in and to the Assets (other than the Wind-Down Amount and the Reserve Payment Amount) with the same priority as they had with respect to the Assets immediately prior to the sale, as if the Debtors' and the Mises en Cause's right, title and interest in and to the

Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale;

[8] **ORDERS** that the Monitor shall administer the Wind-Down Amount in accordance with the provisions of the Sale Agreement including, without limitation, Section 5.18 thereof;

[9] **ORDERS** that: (i) all right, title and interest in and to any portion of the Wind-Down Amount that is not used to pay costs associated with winding-down the Sellers' estate in accordance with Section 5.18 of the Sale Agreement shall vest absolutely in the Purchaser as at the Closing Date and shall promptly be distributed to the Purchaser; and (ii) the Wind-Down Amount shall not be considered to be proceeds of sale of the Assets and the Claims and Encumbrances shall not attach to the Wind-Down Amount;

[10] **ORDERS** that upon the delivery of the Monitor's Certificate to the Purchaser: (i) the Administration Charge provided for in the Initial Order be and is hereby released, expunged and discharged; and (ii) the D&O Charge provided for in the Initial Order be and is hereby released, expunged and discharged;

[11] **ORDERS** the Land Registrar of the Land Registry Office for the Registry Division of Témiscouata, upon presentation of the Monitor's Certificate, in the form appended as Schedule "A" hereto, and a certified copy of this Order accompanied by the required application for registration and upon payment of the prescribed fees, to publish this Order and (i) to proceed with an entry on the index of immovables showing the Purchaser as the absolute owner in regards to the immovable listed in Schedule "B" hereto which are located in Rivière-du-Loup, in the Province of Québec (being hereinafter described the **"Rivière-du-Loup Property"**); and (ii) proceed with the reduction and cancellation of any and all Encumbrances but only

insofar as concerns the Rivière-du-Loup Property as described in Schedule "B", including, without limitation, the following registrations published at the said Land Registry Office for the Registration Division of Témiscouata:

(i)     a hypothec charging buildings only granted in favour of White Birch Paper Company by F.F. Soucy General Partner Inc./Commandité F.F. Soucy Inc. for an amount of $250,000,000 and registered at the office of the Registration Division of Témiscouata on April 7, 2005 under number 12 195 029;

(ii)    a hypothec granted for an amount of $250,000,000 in favour of White Birch Paper Company by F.F. Soucy, Inc. & Partners, Limited Partnership/F.F. Soucy, inc. & associés, Société en commandite and registered at the office of the Registration Division of Témiscouata on April 7, 2005 under number 12 195 030;

(iii)   a first hypothec granted for an amount of $550,000,000 and a second hypothec granted pursuant to the same deed for an amount of $250,000,000 granted in favour of Credit Suisse First Boston, Toronto Branch, by White Birch Paper Company and registered at the office of the Registration Division of Témiscouata on April 7, 2005 under number 12 195 031;

(iv)   a legal hypothec (construction) granted for an amount of $2,692,455.81 registered by Service d'impartition Industriel Inc. against F.F. Soucy S.E.C., as owner, and registered at the office of the Registration Division of Témiscouata on November 18, 2009 under number 16 731 954;

(v)     a legal hypothec (construction) granted for an amount of $2,692,455.81 registered by Service d'impartition Industriel Inc. against F.F. Soucy S.E.C., as owner, and registered at the office of the Registration Division of Témiscouata on November 27, 2009 under number 16 758 360;

(vi)    a hypothec on a universality of immovables granted for an amount of $200,000,000 in favour of Crédit Suisse AG, Toronto Branch, by White Birch Paper Company registered at the office of the Registration Division of Témiscouata on March 4, 2010 under number 16 979 262;

(vii)   a hypothec on the universality of immovables granted for an amount of $200,000,000 in favour of Crédit Suisse AG, Toronto Branch, by F.F. Soucy L.P./F.F. Soucy S.E.C. and registered at the office of the Registration Division of Témiscouata on March 4, 2010 under number 16 979 263; and

(viii)  a prior notice of the exercise of a sale under judicial authority registered by Service d'impartition Industriel Inc. against F.F. Soucy S.E.C., as owner, registered at the office of the Registration Division of Témiscouata on June 15, 2010 under number 17 281 485, which registration refers to the legal hypothecs registered under numbers 16 731 954 and 16 758 360 referred to above;

[12]    **ORDERS** the Land Registrar of the Land Registry Office for the Registry Division of Québec, upon presentation of the Monitor's Certificate, in the form appended as Schedule "A" hereto, and a certified copy of this Order accompanied by the required application for registration and upon payment of the prescribed fees, to publish this Order and (i) to proceed with an entry on the index of immovables showing the Purchaser as the

absolute owner in regards to the immovables listed in Schedule "C" hereto which are located in Québec City, in the Province of Québec (being hereinafter described the **"Quebec City Properties"**); and (ii) proceed with the reduction and cancellation of any and all Encumbrances but only insofar as concerns the Québec City Properties as described in Schedule C, including, without limitation, the following registrations published at the said Land Registry Office for the Registration Division of Quebec:

(i)     a hypothec on a universality of immovables granted for an amount of $550,000,000 in favour of Credit Suisse First Boston Toronto Branch by Stadacona L.P./Stadacona S.E.C. and Stadacona General Partner Inc./Commandité Stadacona Inc. pursuant to a deed registered at the office of the Registration Division on April 7, 2005 under number 12 195 317;

(ii)    a hypothec on a universality of immovables granted for an amount of $250,000,000 in favour of Credit Suisse First Boston Toronto Branch by Stadacona L.P./Stadacona S.E.C. and Stadacona General Partner Inc./Commandité Stadacona Inc. pursuant to a deed registered at the office of the Registration Division on April 7, 2005 under number 12 195 318;

(iii)   a legal hypothec (construction) for an amount of $2,067,704.24 in favour of KSH Solutions Inc. against Stadacona S.E.C. and Commandité Stadacona Inc. and registered at the office of the Registration Division on May 19, 2006 under number 13 298 021;

(iv)    a prior notice of the exercise of a sale by judicial authority in favour of OSLO Construction Inc. against Stadacona S.E.C., owner, and Commandité Stadacona Inc., owner, registered on August 2, 2006 under number 13 534 837, this prior notice being in reference to a

legal hypothec that was registered at the office of the Registration Division under number 13 126 592 which has been totally discharged;

(v) a prior notice of the exercise of a sale by judicial authority in favour of KSH Solutions Inc. against Stadacona S.E.C. and Commandité Stadacona Inc. registered at the office of the Registration Division on October 20, 2006 under number 13 742 043, this prior notice being in reference of the legal hypothec registered under number 13 298 021 referred to in Section (iii) above;

(vi) a hypothec on a universality of property granted for an amount of $200,000,000 in favour of Crédit Suisse AG, Toronto Branch by Stadacona General Partner Inc./Commandité Stadacona inc. pursuant to a deed registered at the office of the Registration Division on March 4, 2010 under number 16 977 835; and

(vii) a hypothec on a universality of property granted for an amount of $200,000,000 in favour of Crédit Suisse AG, Toronto Branch by Stadacona L.P./Stadacona S.E.C. pursuant to a deed registered at the office of the Registration Division on March 4, 2010 under number 16 977 836;

[13] **ORDERS** the Land Registrar of the Land Registry Office for the Registry Division of Papineau, upon presentation of the Monitor's Certificate, in the form appended as Schedule "A" hereto, and a certified copy of this Order accompanied by the required application for registration and upon payment of the prescribed fees, to publish this Order and (i) to proceed with an entry on the index of immovables showing the Purchaser as the absolute owner in regards to the immovables listed in Schedule "D" hereto which are located in Gatineau, in the Province of Québec (being

hereinafter described the **"Gatineau Property"**); and (ii) proceed with the reduction and cancellation of any and all Encumbrances but only insofar as concerns the Gatineau Property as described in Schedule D, including, without limitation, the following registrations published at the said Land Registry Office for the Registration Division of Papineau:

(i)     Hypothec in the amount of $550,000,000 by Papier Masson Ltée in favour of Crédit Suisse, Toronto Branch, in its quality of *"fondé de pouvoir"*, registered on January 25, 2006 under number 13 011 629;

(ii)    Hypothec in the amount of $250,000,000 by Papier Masson Ltée in favour of Crédit Suisse, Toronto Branch, in its quality of *"fondé de pouvoir"*, registered on January 25, 2006 under number 13 011 630;

(iii)   Legal hypothec in the amount of $1,808,000 in favour of Hydro-Québec, registered on September 2, 2009 under number 16 512 303 against the part of the Property known as lot 2 469 374 and located at the civic address 2 Montreal Road West, City of Gatineau;

(iv)    Legal hypothec in the amount of $3,205,539.79 in favour of Hydro-Québec, registered on November 20, 2009 under number 16 737 683 against the part of the Property known as lot 2 469 374 and located at the civic address 2 Montreal Road West, City of Gatineau; and

(v)     Hypothec in the amount of $200,000,000 by Papier Masson Ltée in favour of Crédit Suisse AG, Toronto Branch, registered on March 4, 2010 under number 16 977 911;

[14] **ORDERS** the Québec Personal and Movable Real Rights Registrar, upon presentation of the required form with a true copy of this Vesting Order and the Monitor's Certificate, to reduce the scope of the hypothecs listed in Schedule "E" hereto in connection with the Assets and to cancel, release and discharge all of the Assets Encumbrances in order to allow the transfer to the Purchaser of the Assets free and clear of any and all encumbrances created by those hypothecs;

[15] **ORDERS** that, pursuant to section 11.3 of the CCAA, the Debtors and the Mises en Cause are authorized and directed to assign the contracts, leases and agreements and other arrangements of which the Buyer takes an assignment on Closing pursuant to and in accordance with the terms of the Sale Agreement (the "**Contracts**") and that such assignments are hereby approved and are valid and binding upon the counterparties notwithstanding any restriction or prohibition on assignment contained in any such Contracts;

[16] **ORDERS** that, from and after the Closing Date, all Persons shall be deemed to have waived all defaults then existing or previously committed by the Debtors or the Mises en Cause under, or caused by the Debtors or the Mises en Cause under, and the non-compliance of the Debtors or the Mises en Cause with, any of the Contracts arising solely by reason of the insolvency of the Debtors or the Mises en Cause or as a result of any actions taken by the Debtors or the Mises en Cause pursuant to the Sale Agreement or in these proceedings, and all notices of default and demands given in connection with any such defaults under, or non-compliance with, any of the Contracts shall be deemed to have been rescinded and shall be of no further force or effect;

[17]  **ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof;

[18]  **ORDERS** that neither the Purchaser nor any Designated Purchaser nor any affiliate thereof shall assume or be deemed to assume any liabilities or obligations whatsoever of any of the Debtors or the Mises en Cause (other than as expressly assumed under the terms of the Sale Agreement), including without limitation, any liabilities or obligations in respect of, in connection with or in relation to:  (i) any Seller Employee Plans (other than a Transferred Employee Plan); (ii) any and all termination, severance or related amounts which any current or former employee of the Debtors or the Mises en Cause (other than the Transferred Employees who become employees of the Purchaser or a Designated Purchaser on Closing as provided for in the Sale Agreement) could at any time assert against any of the Debtors or the Mises en Cause; or (iii) any and all former, current or future employees of the Debtors or the Mises en Cause (other than the Transferred Employees who become employees of the Purchaser or a Designated Purchaser on Closing as provided for in the Sale Agreement);

[19]  **ORDERS** that the Purchaser and any Designated Purchasers, and their respective affiliates and officers, directors, employees, delegates, agents and representatives shall, effective immediately upon Closing of the Transaction, be and be deemed to be irrevocably and unconditionally fully and finally released of and from any and all claims, obligations or liabilities whatsoever arising from any event, fact, matter or circumstance occurring or existing on or before the Closing Date in relation to or in connection with the Debtors or the Mises en Cause or their respective present or past businesses, properties or assets, including, without limitation, any and all claims, obligations or liabilities whatsoever, whether known, anticipated or

unknown, in relation to or in connection with the Seller Employee Plans (other than any Transferred Employee Plans) and the former, current or future employees of the Debtors and the Mises en Cause (other than any Transferred Employees who become employees of the Purchaser or a Designated Purchasers on Closing in accordance with the terms and conditions of the Sale Agreement) and provided that the foregoing shall not operate to release the Purchaser or any Designated Purchaser from any liabilities or obligations expressly assumed under the terms of the Sale Agreement;

[20]     **ORDERS** that, notwithstanding:

(i)      the pendency of these proceedings;

(ii)     any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Debtors or the Mises en Cause and any bankruptcy order issued pursuant to any such applications; and

(iii)    any assignment in bankruptcy made in respect of any of the Debtors or the Mises en Cause;

the provisions of the Sale Agreement and the Transaction, and the vesting of the Debtors' and the Mises en Cause's right, title and interest in and to the Assets in the Purchaser or a Designated Purchaser pursuant to this Order and all other transactions contemplated thereby shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Debtors or the Mises en Cause and shall not be void or voidable by creditors of any of the Debtors or the Mises en Cause, nor shall they constitute nor be deemed to be a settlement, fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue or other

challengeable, voidable or reviewable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall they constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation;

[21] **ORDERS** that the Sale Agreement and any related or ancillary agreements shall not be repudiated, disclaimed or otherwise compromised in these proceedings;

[22] **ORDERS** that, pursuant to clause 7(3)(c) of the Personal Information Protection and Electronic Documents Act (Canada) and any substantially similar legislation, the Debtors and the Mises en Cause are authorized and permitted to disclose and transfer to the Purchaser or any Designated Purchaser all Employee Records. The Purchaser or any Designated Purchaser shall maintain and protect the privacy of any personal information contained in the Employee Records and shall be entitled to collect and use the personal information provided to it for the same purpose(s) as such information was used by the Debtors and the Mises en Cause;

[23] **ORDERS** that forthwith upon receipt of the proceeds from the sale of the Debtors' and the Mises en Cause's right, title and interest in and to the Assets, and prior to payment or repayment of any other claims, interests or obligations of or against the Debtors or the Mises en Cause, all outstanding Obligations (as defined in the Interim Financing Credit Agreement (as defined in the Initial Order of this Court dated February 24, 2010)) owed by the Debtors or the Mises en Cause under the Interim Financing Credit Agreement will be repaid in full and in cash from the proceeds of the sale of the Assets (other than the Wind-Down Amount and the Reserve Payment Amount) pursuant to the Sale Agreement;

[24]   **ORDERS** that all Persons shall co-operate fully with the Debtors and the Mises en Cause, the Purchaser, any Designated Purchaser, their respective Affiliates and the Monitor and do all such things that are necessary or desirable for purposes of giving effect to and in furtherance of this Order, the Sale Agreement and the Transaction;

[25]   **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States or elsewhere, including the United States Bankruptcy Court for the Eastern District of Virginia, to give effect to this Order and to assist the Debtors, the Mises en Cause and the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Debtors, the Mises en Cause and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Debtors, the Mises en Cause and the Monitor and their respective agents in carrying out the terms of this Order;

[26]   **ORDERS** that this Order shall have full force and effect in all provinces and territories in Canada;

**THE WHOLE WITHOUT COSTS.**

                                        **MONTRÉAL,** this _____ day of
                                        _____, 2010


                                        _____
                                        **THE HONOURABLE ROBERT**

_____

**MONGEON, J.S.C.**

# SCHEDULE "A"

## FORM OF MONITOR'S CERTIFICATE

**CANADA**

**SUPERIOR COURT**
(Commercial Division)
The *Companies' Creditors Arrangement Act*

**PROVINCE OF QUÉBEC**
**DISTRICT OF MONTRÉAL**
No.: 500-11-038474-108

MONTRÉAL, this _____ day of _____, 2010

IN THE PRESENCE OF:
THE HONOURABLE ROBERT MONGEON, J.S.C.

IN THE MATTER OF THE PLAN OF ARRANGEMENT AND COMPROMISE OF:

WHITE BIRCH PAPER HOLDING COMPANY

-and-

WHITE BIRCH PAPER COMPANY

-and-

STADACONA GENERAL PARTNER INC.

-and-

BLACK SPRUCE PAPER INC.

-and-

F.F. SOUCY GENERAL PARTNER INC.

-and-

3120772 NOVA SCOTIA COMPANY

-and-

**ARRIMAGE DE GROS CACOUNA INC.**

-and-

**PAPIER MASSON LTÉE**

**Debtors**

-and-

**ERNST & YOUNG INC.**

**Monitor**

-and-

**STADACONA LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY, INC. & PARTNERS, LIMITED PARTNERSHIP**

**Mises en Cause**

## MONITOR'S CERTIFICATE

**RECITALS:**

A.      Pursuant to an Order of the Honourable Robert Mongeon, J.S.C. dated February 24, 2010, the Debtors commenced proceedings pursuant to the

*Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as the monitor (the "**Monitor**") of the Debtors and the Mises en Cause.

B.     Pursuant to an Order of the Court dated ●, the Court approved a sale transaction (the "**Transaction**") contemplated by an asset sale agreement (the "**Sale Agreement**") dated August 10, 2010 amongst White Birch Paper Company and the other entities identified therein as sellers (collectively, the "**Sellers**"), as sellers, and WB Acquisition LLC (the "**Purchaser**"), as purchaser, for the sale of substantially all of the Assets of the Sellers and provided for the vesting in the Purchaser or a Designated Purchaser of the Debtor's and the Mises en Cause's right, title and interest in and to the Assets, which vesting is to be effective with respect to the Assets upon the delivery by the Monitor to the Purchaser of a certificate confirming: (i) the payment by the Purchaser of the Purchase Price for the Assets; (ii) that the conditions to Closing as set out in Article VIII  of the Sale Agreement have been satisfied or waived by the Purchaser and/or the Sellers, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Monitor.

C.     Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

**THE MONITOR CERTIFIES** the following:

1.     The Purchaser has paid and the Monitor has received the Purchase Price for the Assets payable on the Closing Date pursuant to the Sale Agreement;

2. The conditions to Closing as set out in Article VIII of the Sale Agreement have been satisfied or waived by the Purchaser and/or the Sellers, as applicable; and

3. The Transaction has been completed to the satisfaction of the Monitor;

4. This Certificate was delivered by the Monitor at     [TIME] on     [DATE].

**ERNST & YOUNG INC.**
**In its capacity as the monitor appointed by the Court in the matter of the proposed compromise and arrangement of White Birch Paper Holding Company *et al*.**

Per: _____
       Name:
       Title::

## SCHEDULE "B"

## THE RIVIÈRE-DU-LOUP PROPERTY

## SPECIFICALLY DESCRIBED IMMOVABLES

Immovables known and designated as being composed of lots FOUR MILLION FIFTY-SIX THOUSAND NINE HUNDRED AND THIRTY-TWO, FOUR MILLION FIFTY-SIX THOUSAND NINE HUNDRED AND THIRTY-FOUR, FOUR MILLION FIFTY-SIX THOUSAND NINE HUNDRED AND THIRTY-FIVE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND SIXTY-THREE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND SIXTY-NINE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND SEVENTY-ONE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND EIGHTY-FIVE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND EIGHTY-SIX, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND EIGHTY-SEVEN, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND EIGHTY-EIGHT, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND NINETY-TWO and THREE MILLION SEVEN HUNDRED AND FORTY-NINE THOUSAND FIVE HUNDRED AND SEVENTY (4056932, 4056934, 4056935, 4058163, 4058169, 4058171, 4058185, 4058186, 4058187, 4058188, 4058192 and 3749570), all of the Cadastre du Québec, Registration Division of Témiscouata.

With all buildings, installations, structures, equipments and facilities erected and located in, under, on and over the said immovables including, without limitation, the buildings bearing civic numbers 152 and 191 Delage Street, and 1 Dionne Street, City of Rivière-du-Loup, Province of Québec, G5R 3P9, G5R 6E2 and G5R 2M3 and also 130, 275, 275A, 282 and 284 Delage Street and 277B Saint André Street, City of Rivière-du-Loup, Province of Québec.

As the said immovables now subsist with their respective rights, members and appurtenances, without exception or reserve of any kind, and together with and subject to all servitudes and other rights, continuous or discontinuous, apparent or unapparent, attached thereto, including without limitation, and more specifically, (i) any servitudes and other rights created pursuant to a Deed of Superficies and Servitudes, passed before Sheldon Merling, Notary, on April 10, 1979, registered at said Registration Division, under number 226914, as amended pursuant to (a) a Deed of Amendment, passed before Robert Alain, Notary, on December 15, 1999, registered at said Registration Division under number 351992, and (b) a Deed of Amendment passed under private writing, on April 6, 2005, registered at said Registration Division under number 12 196 553, and as same may be amended from time to time (collectively the **"Deed of Superficies"**) and (ii) any right, title and interest in and to the "common facilities" (within the meaning of the Conflicts of Interest Agreement, as defined in the Deed of Superficies).

SCHEDULE "C"

THE QUEBEC CITY PROPERTIES

SPECIFICALLY DESCRIBED IMMOVABLES

### 1.     Property located at 10 des Capucins Boulevard, Quebec City

Immovables known and designated as being composed of lots TWO MILLION THREE HUNDRED AND FORTY-SEVEN THOUSAND TWO HUNDRED AND TWENTY-THREE and FOUR MILLION THREE HUNDRED AND SEVENTY-EIGHT THOUSAND EIGHT HUNDRED AND TWENTY-ONE (2 347 223 and 4 378 821), all of the Cadastre du Québec, Registration Division of Québec.

With all buildings, installations, structures, equipments and facilities erected and located in, under, on and over the said immovables including, without limitation, the buildings bearing civic number 10, des Capucins Boulevard, Québec, Province of Québec, G1K 7H9.

As the said immovables now subsist with their respective rights, members and appurtenances, without exception or reserve of any kind, and together with and subject to all servitudes and other rights, continuous or discontinuous, apparent or unapparent, attached thereto.

### 2.     Property located at 1200 Lapierre Street, Québec City

Immovables known and designated as being composed of lots ONE MILLION ONE HUNDRED AND SIXTEEN THOUSAND SEVEN HUNDRED AND THIRTY-SIX, ONE MILLION ONE HUNDRED AND SIXTEEN THOUSAND EIGHT HUNDRED AND SIXTY-SIX, ONE MILLION ONE HUNDRED AND SEVENTEEN THOUSAND AND FORTY-FOUR, ONE MILLION ONE HUNDRED AND SEVENTEEN THOUSAND AND SEVENTY-ONE, ONE MILLION ONE HUNDRED AND SEVENTEEN THOUSAND THREE HUNDRED AND THIRTY-FOUR and ONE MILLION ONE HUNDRED AND NINETEEN THOUSAND TWO HUNDRED AND EIGHTY-FIVE (1 116 736, 1 116 866, 1 117 044, 1 117 071, 1

117 334 and 1 119 285), all of the Cadastre of Québec, Registration Division of Québec.

With all buildings, installations, structures, equipments and facilities erected and located in, under, on and over the said immovables including, without limitation, the buildings bearing civic number 1200, Lapierre Street, Québec, Province of Québec, G3E 1H8.

As the said immovables now subsist with their respective rights, members and appurtenances, without exception or reserve of any kind, and together with and subject to all servitudes and other rights, continuous or discontinuous, apparent or unapparent, attached thereto.

## SCHEDULE "D"

## THE GATINEAU PROPERTY

## SPECIFICALLY DESCRIBED IMMOVABLES

Immovables known and designated as being composed of lots TWO MILLION FOUR HUNDRED AND SIXTY-NINE THOUSAND FOUR HUNDRED AND THIRTY-TWO, TWO MILLION FOUR HUNDRED AND SIXTY-NINE THOUSAND THREE HUNDRED AND SEVENTY-FOUR, TWO MILLION FOUR HUNDRED AND SEVENTY-ONE THOUSAND AND FIFTY-SIX and TWO MILLION FOUR HUNDRED AND SEVENTY-ONE THOUSAND AND FIFTY-FIVE (2 469 432, 2 469 374, 2 471 056 and 2 471 055), all of the Cadastre of Québec, Registration Division of Papineau.

With all buildings, installations, structures, equipments and facilities erected and located in, under, on and over the said immovables including, without limitation, the buildings bearing civic numbers 1 Montreal Road West, 2 Montreal Road West and vacant emplacements on Montreal Road West, City of Gatineau, Province of Québec.

As the said immovables now subsist with their respective rights, members and appurtenances, without exception or reserve of any kind, and together with and subject to all servitudes and other rights, continuous or discontinuous, apparent or unapparent, attached thereto.

# SCHEDULE "E"

## CHARGES TO BE RELEASED AND DISCHARGED AT THE REGISTRY OF PERSONAL AND MOVABLE REAL RIGHTS

**[NTD: to follow]**

## Exhibit B

## Bid Procedures

## Bidding Procedures

The bidding procedures contained herein (the "Bidding Procedures") are to be employed with respect to that certain Asset Sale Agreement, by and between White Birch Paper Company (together with certain subsidiaries, including Bear Island Paper Company, L.L.C., the "Sellers") and BD White Birch Investment LLC (the "Purchaser"), dated as of August 10, 2010 (as amended, modified or supplemented, the "Sale Agreement"), concerning, among other things, the sale, conveyance, assignment and transfer (the "Sale") of substantially all of the Sellers' assets (the "Assets"). Capitalized terms used herein but not defined have the meanings ascribed to them in the Sale Agreement.

The Sale is subject to competitive bidding as set forth herein (the "Bidding Process") and approval by the Superior Court of Québec (the "CCAA Court") and the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court," and together with the CCAA Court, the "Courts") at hearings (the "Sale Hearings") pursuant to the *Companies' Creditors Arrangement Act* (the "CCAA") and sections 105, 363 and 365 of title 11 of the United State Code (the "Bankruptcy Code"), respectively. Furthermore, the following Bidding Procedures and related bid protections provide a mechanism to reimburse Purchaser for its efforts and agreements to date and to facilitate a full and fair process seeking to maximize the value of the Assets for the benefit of the Sellers' estates, their creditors and other parties in interest.

## Background

Further to the orders issued by the CCAA Court and the Bankruptcy Court approving the Sale and Investor Solicitation Procedures (the "SISP Procedures" and the "SISP Orders") on April 28, 2010 and April 29, 2010, respectively, the Sellers, with the assistance of their advisors, have been engaged in a comprehensive marketing process to solicit proposals in connection with the Sale.

To this end, the Sellers' financial advisor contacted certain strategic and financial parties whom the financial advisor determined, in its reasonable professional judgment, may have an interest in acquiring all or any portion of the Assets. Such parties were provided with an initial offering summary and were invited to express their interest in making an offer to acquire all or substantially all of the Assets.

For those interested parties who then entered into a confidentiality agreement and were determined in the Sellers' business judgment to be capable of consummating the Sale (the "Phase 1 Qualified Bidders"), each received a confidential information memorandum and access to a virtual data room which contained information regarding the Assets.

By June 15, 2010, the Sellers had received four non-binding indications of interest regarding the purchase of all or any portion of the Assets. Upon an evaluation of these indications of interest, the Sellers invited two of these parties (each, a "Phase II Qualified Bidder") to perform due diligence with respect to the Assets, with the intention that one of the Phase II Qualified Bidders would serve as a stalking horse bidder at an auction of the Assets (the "Auction").

From June 15, 2010 through July 15, 2010, the Sellers engaged in active discussions with the Phase II Qualified Bidders and conducted site visits at the Sellers' facilities in an effort to complete a comprehensive due diligence process.

As of the July 15, 2010 deadline established pursuant to the SISP Procedures and the SISP Order, only the Purchaser had provided the Sellers with an offer to purchase the Assets. Accordingly:

(i)     on August 10, 2010, the Canadian Sellers filed a motion with the CCAA Court seeking an order for approval of (I) execution and delivery of the Sale Agreement by the Canadian Sellers, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the Sale Agreement, and (III) approval of the Bidding Procedures and Sale of the Canadian Sellers' rights, title and interests in and to the Assets pursuant to the procedures set forth herein (the "Canadian Stalking Horse and Bidding Procedures Order");

(ii)     on August [●], 2010, the CCAA Court entered the Canadian Stalking Horse and Bidding Procedures Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement to the Purchaser;

(iii)     on August 10, 2010, the U.S. Sellers filed the Motion of Bear Island Paper Company, L.L.C. for Entry of Orders Approving the (A) Form of the Purchase Agreement (B) Bidding Procedures (C) Form and manner of Notice of the Auction and Sale Hearing (D) Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (E) Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (F)Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (the "U.S. Stalking Horse and Bidding Procedures Order," and together with the Canadian Stalking Horse and Bidding Procedures Order, the "Stalking Horse and Bidding Procedures Orders"); and

(iv)     on August [●], 2010, the Bankruptcy Court entered the U.S. Stalking Horse and Bidding Procedures Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement to the Purchaser.

### "Stalking Horse"

Pursuant to the SISP Procedures and the SISP Orders, the Purchaser has been designated by the Sellers to be the "Stalking Horse Bidder" for the Sale.

### Participation Requirements

Only those persons or entities that are or shall become Phase 1 Qualified Bidders pursuant to the SISP Procedures and the SISP Orders (including any lender under the DIP Credit

Agreement or the First Lien Credit Agreement) may participate in the Bidding Process. For all purposes herein, the Purchaser is deemed a Phase 1 Qualified Bidder.

## Due Diligence

Only Phase 1 Qualified Bidders may conduct due diligence and such due diligence must be completed by **5:00 p.m. (Eastern Time) on August 30, 2010**.

At the Sellers' discretion, due diligence access may include management presentations (as may be scheduled by the Sellers), access to physical and online data rooms, on-site inspections and such other matters that a Phase 1 Qualified Bidder may reasonably request and as to which Sellers, in their reasonable exercise of discretion, may agree.

The Sellers will designate employee(s) or other representative(s) to coordinate a Phase 1 Qualified Bidder's reasonable requests for additional information and due diligence access. In addition, the Sellers may, in their discretion, coordinate due diligence efforts such that multiple Phase 1 Qualified Bidders have simultaneous access to due diligence materials. Neither the Sellers nor any of their affiliates (nor any of their respective representatives) are obligated to furnish any information relating to all or any portion of the Assets to any person other than to Phase 1 Qualified Bidders.

## Bid Deadline

All bids must be submitted to the Sellers c/o Lazard Middle Market LLC, 10 South Wacker Drive, 33rd Floor, Chicago, IL 60606 (Attn.: Craig Korte, craig.korte@lazardmm.com), so as to be **actually received** by **5:00 p.m. (Eastern Time) on August 30, 2010** (the "Bid Deadline").

Copies of all bids shall be simultaneously provided by facsimile transmission, electronic mail, personal delivery or reliable overnight courier service to counsel to the Sellers, the Monitor in the CCAA Proceedings, counsel to the Purchaser and counsel to the Administrative Agent, Syndication Agent and Majority Lenders under the DIP Credit Agreement (the "DIP Parties").

## Qualified Bids

Only bids received from a Phase 1 Qualified Bidder before the Bid Deadline that include documents and satisfy each of the requirements set forth below (each a "Qualified Bid") will be considered at the Auction:

    (i)    must be received by the Bid Deadline (as may be extended pursuant to the conditions discussed below);

    (ii)    states that the applicable Phase 1 Qualified Bidder offers to purchase all or substantially all of the Assets upon the terms and conditions as substantially set forth in the Sale Agreement, including without limitation, with respect to certainty and timing of closing, or upon alternative terms and conditions that Sellers determine in their reasonable business judgment, after consultation

with their advisors and the Monitor, are no less favorable than the terms and conditions of the Sale Agreement;

(iii)    states that the applicable Phase 1 Qualified Bidder offers to purchase all or substantially all of the Assets for a purchase price or other value that is equal to or greater than the sum of the Purchase Price, <u>plus</u> (A) the amount of the Break-Up Fee, <u>plus</u> (B) an amount in respect of the Expense Reimbursement, <u>plus</u> (C) U.S. $1,000,000;

(iv)    must be irrevocable until the closing of the Sale if such Phase 1 Qualified Bidder is selected as either the winning bidder (the "<u>Winning Bidder</u>") or the alternative bidder (the "<u>Alternative Bidder</u>");

(v)    includes (A) a duly authorized and executed form of the Sale Agreement, including the purchase price for all or any portion of the Assets expressed in U.S. Dollars, together with all exhibits and schedules thereto, (B) to the extent required by the terms and conditions of such bid, any ancillary agreements as described in the Sale Agreement together with all exhibits and schedules thereto, (C) copies of such materials marked to show those amendments and ancillary modifications to the Sale Agreement (respectively, the "<u>Marked Agreements</u>" and "<u>Marked Ancillary Agreements</u>") and (D) proposed orders for the CCAA Court and Bankruptcy Court to approve the Sale;

(vi)    must be accompanied by a deposit (by means of a certified bank check from a U.S. bank or by wire transfer payable to White Birch Paper Company) of $5,000,000 (the "<u>Deposit</u>") to be dealt with as provided for under "Return of Deposits" below;

(vii)    is not conditioned on the outcome of unperformed due diligence by the Phase 1 Qualified Bidder and includes an acknowledgement and representation that the Phase 1 Qualified Bidder has had an opportunity to conduct any and all required due diligence prior to making its bid;

(viii)    must not be conditioned upon approval by the Bankruptcy Court or the CCAA Court of any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment;

(ix)    must include written evidence of a firm, irrevocable commitment for financing from a creditworthy bank or financial institution that will provide such financing without (A) alteration of conditions or (B) delays and that is not contingent as of the Auction, or, other evidence of ability, as determined in the Sellers' reasonable business judgment, to consummate the transaction contemplated by the Marked Agreements;

(x)    fully discloses the identity of each entity that will be bidding for all or any portion of the Assets or otherwise sponsoring or participating in connection

with such bid, and the complete terms of any such participation, including the identification of the Phase 1 Qualified Bidder's principal advisors;

(xi)    contains full details of the proposed number of Sellers' employees who will become employees of the Phase 1 Qualified Bidder and any proposed measures associated with (A) their continued employment and (B) the employment of all employees who will become employees of the Phase 1 Qualified Bidder;

(xii)i    ncludes (A) an acknowledgment and representation that the Phase 1 Qualified Bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assumed and assigned pursuant to the Sale Agreement (or identifies, with particularity, which of such contracts and leases the Phase 1 Qualified Bidder does not wish to assume, or, alternatively, which additional contracts or leases the Phase 1 Qualified Bidder does wish to assume), (B) contains full details of the Phase 1 Qualified Bidder's proposal for the treatment of related cure costs and (C) identifies, with particularity, any contract or lease the assumption and assignment of which is a condition to closing;

(xiii)    includes an acknowledgement and representation that the Phase 1 Qualified Bidder (A) relied solely upon its own independent review, investigation and/or inspection of any documents and/or all or any portion of the Assets in making its bid and (B) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding all or any portion of the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreement or the Marked Ancillary Agreements;

(xiv)    includes evidence, in form and substance reasonably satisfactory to the Sellers, of authorization and approval from the Phase 1 Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(xv)    includes evidence, in form and substance reasonably satisfactory to the Sellers of compliance or anticipated compliance with all regulatory approvals (including, if applicable, anti-trust and Canadian regulatory approval), the anticipated time frame for such compliance and any anticipated impediments for obtaining such approvals;

(xvi)    includes evidence of the Phase 1 Qualified Bidder's ability to comply with Section 11.3 of the CCAA and Section 365 of the Bankruptcy Code (to the extent applicable), which includes providing adequate assurance of such Phase 1 Qualified Bidder's ability to perform the contracts and leases proposed in its bid to be assumed by, or subleased to, the Phase 1 Qualified

Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases; and

(xvii)    contains other information reasonably requested by the Sellers.

Whether a bid of a Phase 1 Qualified Bidder meets the foregoing requirements to become a Qualified Bid will be determined by the Sellers in their reasonable business judgment, after consultation with their advisors and the Monitor; provided that the Sellers, in evaluating such bids, may not waive substantial compliance with any of the requirements set forth above and may not waive strict compliance with the requirements set forth in (i), (ii), (iii), (iv), (v)(A), (vi), (viii) and (ix) above. The Sellers will notify the Purchaser, the DIP Parties and the applicable Phase 1 Qualified Bidder if they determine that a Phase 1 Qualified Bidder has submitted a Qualified Bid and provide a copy of that bid to the Purchaser and the DIP Parties, in each case on the day that any such determination is made. The Sale Agreement, as it may be amended, modified, or supplemented in accordance with its terms, shall constitute a Qualified Bid for all purposes.

The Sellers, in their reasonable business judgment, after consultation with their advisors and the Monitor, may reject any proposal (other than the Sale Agreement) that (a) does not meet any of the requirements set forth above, (b) is on terms that are more burdensome or conditional than the terms of the Sale Agreement, (c) entitles the Phase 1 Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or (d) is contrary to the best interests of the Sellers' estates, their creditors and other parties in interest.

If the Sellers do not receive any Qualified Bids other than the Sale Agreement by the Bid Deadline, the Auction shall be cancelled and the Sellers shall report the same to the Bankruptcy Court and the CCAA Court and shall proceed immediately with the Sale pursuant to the terms of the Sale Agreement.

## Auction, Bidding Increments and Bids Remaining Open

If, in addition to the Qualified Bid submitted by the Purchaser, the Sellers receive one or more other Qualified Bids, the Sellers shall conduct the Auction at the offices of Kirkland & Ellis, 601 Lexington Avenue, New York, New York 10022, beginning at **10:00 a.m. (Eastern Time) on September 1, 2010** or at such later time or other place as the Sellers will notify all Qualified Bidders.

At least two days prior to the Auction, the Sellers shall provide the Purchaser, the DIP Parties and all Qualified Bidders with complete copies of all Qualified Bids. The Auction shall run in accordance with the following procedures:

(i)    Only the Purchaser, Sellers, representatives of the DIP Parties and any Qualified Bidders (and the advisors to each of the foregoing) shall be entitled to attend the Auction and only the Purchaser and such Qualified Bidders shall be entitled to make any subsequent Qualified Bids at the Auction.

(ii)     At the Auction, all Qualified Bidders shall be permitted to increase their Qualified Bids in accordance with the procedures set forth herein (each, a "Subsequent Bid"). All Subsequent Bids presented during the Auction shall be made and received in one room on an open basis. All participating Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each participating Qualified Bidder shall be fully disclosed to all other Qualified Bidders and that all material terms of each Subsequent Bid presented during the Auction will be fully disclosed to the Purchaser and all other participating Qualified Bidders throughout the entire Auction.

(iii)     All Qualified Bidders at the Auction must have at least one individual representative with authority to bind such Qualified Bidder present in person at the Auction.

(iv)     All proceedings at the Auction shall be conducted before and transcribed by a court stenographer.

(v)     At least one (1) day prior to the Auction, Sellers will advise the Purchaser and all other Qualified Bidders which Qualified Bid the Sellers have determined in their reasonable business judgment, after consultation with their advisors and with the Monitor, constitutes the then highest or otherwise best offer for the Assets (the "Starting Bid").

(vi)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round (i) at least one Subsequent Bid is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid and meets the overbid requirement set forth in paragraph (vii) below, and (ii) that the Sellers determine in their reasonable business judgment, after consultation with its advisors and with the Monitor, is a higher or otherwise better offer than the then current leading Qualified Bid.

(vii)     Bidding at the Auction shall be in increments of $500,000 and shall continue until such time as the highest and best bid is determined by the Sellers in their reasonable business judgment after consultation with their advisors and with the Monitor. The Sellers, in their sole discretion, shall have the right to modify the bidding increments throughout the course of the Auction. For the purpose of evaluating the value of the consideration provided by each bid (including any Subsequent Bid by the Purchaser) presented at the Auction, the value will: (i) be deemed to be the net consideration payable to the Sellers after considering, *inter alia,* any break-up fee or expense reimbursement due to the Purchaser under the Sale Agreement; and (ii) take into account any additional liabilities to be assumed by a Qualified Bidder as well as any additional costs which may be imposed on the Sellers under any such bid.

(viii)     After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the Qualified Bid or Subsequent Bid, as the case may

be, that the Sellers have determined in their reasonable business judgment after consultation with their advisors and with the Monitor to be the then highest or best bid (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had an opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

(ix)     At the conclusion of the Auction pursuant to paragraph (vii) above, the Sellers will announce the Qualified or Subsequent Bid which they have determined in their reasonable business judgment, after consultation with their advisors and the Monitor, to be the highest and best bid (the "Winning Bid") and such Winning Bid will be submitted to the Courts for approval at the Sale Hearings, along with the second highest and best Qualified Bid (the "Alternative Bid"). The Sellers will be deemed to have accepted any Qualified Bid only when such Qualified Bid is determined to be the Winning Bid and has been approved by the Courts.

(x)      At the Auction, the Sellers, after consultation with their advisors and with the Monitor, may employ and announce additional procedural rules that are fair and reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction; provided, however, that such rules are (a) not inconsistent with the Bidding Procedures, the Bankruptcy Code, the CCAA, any order of the Courts or the CCAA Court entered in connection in connection with the Bidding Procedures and (b) disclosed to each Qualified Bidder at the Auction.

Notwithstanding anything herein to the contrary, the Sellers may not, without the written consent of the applicable agent under the DIP Credit Agreement, select a bid as the Winning Bid unless such bid provides for the payment, on the closing date of the transaction with the Winning Bidder, in full in cash all obligations under the DIP Credit Agreement.

## Credit Bidding

Notwithstanding anything herein to the contrary, the applicable agent under the DIP Credit Agreement and the applicable agent under the First Lien Credit Agreement shall each be entitled to credit bid pursuant to section 363(k) of the Bankruptcy Code and other applicable law.

## Break-up Fee and Expense Reimbursement

If the Sellers accept a Qualified Bid other than a bid of the Purchaser as the Winning Bid, then the Sellers shall pay to the Purchaser as compensation for Purchaser's efforts in connection with the negotiation and execution of the Sale Agreement and the transactions contemplated thereby an amount equal to the Break-Up Fee and the Expense Reimbursement due to the Purchaser pursuant to the terms of the Sale Agreement, as approved by the Courts under the Stalking Horse and Bidding Procedures Orders.

## The Sale Hearings

The Sale Hearings are to be held immediately following the Auction (if any), and in any event, the Sellers shall use commercially reasonable efforts to have the CCAA Court and the Bankruptcy Court issue orders approving the Sale by September 8, 2010. The Sale Hearing before the CCAA Court is not yet scheduled but is intended to be held on or before September 8, 2010. The Sale Hearing before the Bankruptcy Court is scheduled for **September 8, 2010 at 10:00 a.m. (prevailing Eastern Time)**. At the Sale Hearings, the Sellers will seek entry of the Sale Orders, which will, among other things, authorize and approve the Sale (i) to the Purchaser, if no other Qualified Bid is received and accepted as the Winning Bid and pursuant to the terms and conditions set forth in the Sale Agreement or (ii) to the Winning Bidder, if a Qualified Bid other than from the Purchaser is received and accepted by the Sellers as the Winning Bid in accordance with these Bidding Procedures and pursuant to the terms and conditions set forth in the Sale Agreement or marked form of the Sale Agreement submitted by that Winning Bidder. All Qualified Bids (other than the Winning Bid and the Alternative Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Winning Bid and the Alternative Bid by the Courts pursuant to the Sale Orders.

If, following the entry of the Sale Orders by the Courts, the Winning Bidder fails to consummate a transaction with Sellers in respect of such Winning Bid that is the result of a breach or failure to perform on the part of such Winning Bidder, then the Alternative Bid shall be deemed the Winning Bid and Sellers shall be authorized to consummate a transaction in respect of the Alternative Bid without further orders of the Courts.

## Failure to Consummate Purchase

If the Winning Bidder (other than Purchaser) fails to consummate the Sale, and such failure is the result of a breach by the Winning Bidder, the Winning Bidder's Deposit shall be forfeited to Sellers and, except to the extent provided in the Sale Agreement or Marked Agreement, the Sellers specifically reserve the right to seek all available damages from such person or entity.

## Return of Deposits

The Deposits of the Winning Bidder and the Alternative Bidder shall be retained by The Bank of New York Mellon and such Qualified Bids shall remain open until the closing of a transaction with the Winning Bidder regarding the Winning Bid. The Deposits of all other Qualified Bidders shall be promptly returned after entry of the Sale Orders. The Deposit of the Qualified Bidder submitting the Alternative Bid shall be promptly returned after the closing of the sale to the Winning Bidder.

## Modifications

The Sellers, after consultation with their advisors and the Monitor, may (a) determine, in their reasonable business judgment, which Qualified Bid, if any, is the highest or otherwise best offer, (b) reject, at any time before entry of orders of the Courts approving a Qualified Bid, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the

Bankruptcy Code, the CCAA, these Bidding Procedures or the terms and conditions of the Sale Agreement or (iii) contrary to the best interests of Sellers' estates, their creditors and other parties in interest, and (c) with the prior consent of Purchaser, extend the Bid Deadline, the date of Auction or the date of either of the Sale Hearings; provided, however, that if the Purchaser submits the only Qualified Bid, the terms provided in clauses (a) and (b) above shall be inoperative.

## **Other**

In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the CCAA Court and the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.